United States Court of Appeals,

Eleventh Circuit.

No. 95-6781.

NATIONAL COAL ASSOCIATION, Alabama Land and Mineral Corporation, Allied Signal, Inc., Berwind Corporation, Bethlehem Steel Corporation, Costain Coal, Inc., LTV Steel Company, Mountain Laurel Resources Company, The Pittston Company, Plaintiffs-Appellees,

v.

Shirley S. CHATER, Commissioner of Social Security, Defendant-Appellant.

April 26, 1996.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV 94-H-0780-S), James Hughes Hancock, Judge.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and CLARK, Senior Circuit Judge.

PER CURIAM:

The Commissioner of Social Security appeals from a grant of summary judgment for the plaintiffs, requiring her to recompute premiums paid by coal operators under a federal statute that creates a benefits plan for mine workers. The sole issue in this appeal is the meaning of the word "reimbursements" as used in the statutory formula for calculating health benefit premiums. We affirm the district court.

I. Background

The financial instability of health and retirement benefit plans for mine workers and retirees historically has been a significant factor precipitating disputes between mine workers and coal operators. From 1946 to 1992, health benefits for miners were provided through a series of multiemployer plans created under agreements between the United Mineworkers of America (UMWA) and the

National Bituminous Coal Operators' Association. By 1989, the two multiemployer plans that provided health benefits to retirees, the 1950 UMWA Benefit Plan and Trust, and the 1974 UMWA Benefit Plan and Trust, were operating at a deficit. The financial instability of the plans led to a breakdown in labor relations: the Pittston Company ceased making contributions to the plans in 1990, and an eleven-month strike ensued. *In re Chateaugay Corp.,* 53 F.3d 478, 484 (2d Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995).

Congress recognized the potential for continued disruption in the coal industry without an adequately funded source for the continued provision of benefits. With the aid of a study on the issue by a Department of Labor commission,[1] Congress passed the Coal Industry Retiree Health Benefit Act ("the Act"), Pub.L. No. 102-46, 106 Stat. 3036 (1992), codified at 26 U.S.C. §§ 9701-9722 (1994). The purpose of the Act was to remedy the problems in funding health care benefits for the beneficiaries of the former UMWA plans while retaining a benefits program that was privately financed. § 19142, 106 Stat. at 3037.

To accomplish this purpose, the Act basically consolidated the 1950 and 1974 UMWA Benefit Plans into one plan for the provision of health and retirement benefits called the UMWA Combined Benefit Fund ("Combined Fund"). 26 U.S.C. § 9702(a)(2). The Act directed

---

[1] The Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, *A Report to the Secretary of Labor and the American People* (Nov. 1990), *reprinted in Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing Before the Subcomm. on Medicare and Long-Term Care of the Senate Finance Comm.,* 102d Cong., 1st Sess. 142, 167-81 (1991).

the Secretary of Health and Human Services ("Secretary of HHS") to assign eligible beneficiaries of the Combined Fund to coal operators according to certain criteria; a 1994 amendment to the Act replaced the Secretary with the Commissioner of Social Security ("Commissioner"). 26 U.S.C. § 9706; Social Security Independence and Program Improvements Act, Pub.L. No. 103-296, § 108(h)(9)(A), 108 Stat. 1464, 1487. Assigned coal operators finance the Combined Fund by paying annual per-beneficiary premiums as directed by the Act. 26 U.S.C. § 9704(a). The portion of the annual premium for health benefits is calculated by the Commissioner using a formula in § 9704(b)(2), which reads in part:

> The Commissioner ... shall calculate a per beneficiary premium for each plan year beginning on or after February 1, 1993, which is equal to the sum of—
>
> (A) the amount determined by dividing—
>
> (i) the aggregate amount of payments from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for health benefits (less *reimbursements* but including administrative costs) for the plan year beginning July 1, 1991, for all individuals covered under such plans for such plan year, by
>
> (ii) the number of such individuals ...[2]

26 U.S.C. § 9704(b)(2) (emphasis added). The meaning of the word "reimbursement" in this section is the sole issue disputed by the parties to this appeal.

In order to understand the controversy in this case, it is important to understand how the 1950 and 1974 UMWA Benefit Plans acted in combination with government benefits programs, like

---

[2]The amount calculated under § 9704(b)(2)(A) is adjusted according to any increase in the medical component of the Consumer Price Index during the plan year. 26 U.S.C. § 9704(b)(2)(B).

Medicare, to provide health care services for beneficiaries. Health care coverage under the former UMWA plans was limited to services that were not covered by Medicare or other government benefit programs. But to promote efficiency for the payors and convenience for the beneficiaries, the UMWA plans entered into a series of agreements with the Health Care Financing Administration ("HCFA"), the governmental agency that administers Medicare, under which the UMWA plans would pay providers all the covered costs of the beneficiaries' health care. Medicare would then reimburse the UMWA plans for services covered by Medicare Part B[3] and related administrative costs.

Prior to June of 1990, the payments made by HCFA pursuant to its agreement with the UMWA plans were calculated on a traditional cost basis. The UMWA plans submitted reports of Medicare services actually received by their beneficiaries, and HCFA used Medicare cost principles to calculate the appropriate payment to the benefit plans. The process of calculating cost-based reimbursement for benefit plans of this size was complicated, and disputes frequently arose over the amount that HCFA would pay the UMWA plans.

In 1990, the UMWA plans and HCFA signed a new contract that employed a risk-capitation method for calculating the payments from HCFA to the benefit plans. (R. 2-28 Defs.' Ex. 5.) Under the new method, HCFA paid a predetermined amount per plan member per month, without regard to the amount of money that the UMWA plans actually

---

[3]The Medicare program is divided into two parts. Part A covers services by institutional providers, like hospitals, and Part B covers services by non-institutional providers, like physicians. Only Part B is involved in this case.

spent on Medicare-covered services.  The risk-capitation method was considered desirable by both parties.  The UMWA plans hoped that using this method would prevent the protracted disputes that had occurred over the amount of the HCFA payments.  HCFA favored the risk-capitation method because it gave the UMWA plans the incentive to provide Medicare-covered services more efficiently, and because the amount of its payment to the plans would be more certain.

The contract between HCFA and the UMWA plans using the risk-capitation method has been renewed every year since its inception;  the Combined Fund has been substituted for the UMWA plans.  The 1990 contract, as well as each of the renewal contracts in the record, characterize the payment made by HCFA to the UMWA plans under the contract alternatively as a "payment" or "capitation payment", and as "reimbursement."  (R. 2-28 Defs.' Exs. 5, 6, 7.)[4]

---

[4]The contract that was in effect from July 1, 1990, to June 30, 1993, reads in part:

> I. Reimbursement
>
> Pursuant to waivers ... [T]he [UMWA plan(s) ] will be reimbursed on a risk-based capitated payment basis for a period of 3 years, beginning July 1, 1990 and ending June 30, 1993.  The [UMWA plan(s) ] will furnish medical and other health services to its enrollees who are entitled to benefits under Part B of the Medicare program.
>
> The capitation payment for the period beginning July 1, 1990 and ending June 30, 1991, will be $141.87 per member per month....
>
> No reimbursement will be made to the [Combined Fund] for covered Part A and Part B services furnished by a provider of services....

(R. 2-28 Defs.' Ex. 5.)

The Act requires the trustees of the Combined Fund to submit to the Commissioner "information as to the benefits and covered beneficiaries under the fund, and such other information as the [Commissioner] may require to compute any premium under this section." 26 U.S.C. § 9704(h). In September of 1993, the trustees submitted a financial report for the 1992 plan year ("base year") to the Secretary of HHS, the Commissioner's predecessor under the Act. The report showed that in the base year, the UMWA plans spent $156.8 million on Medicare Part B services and related administrative expenses. The report also showed that, pursuant to their contract with HCFA, the plans received $182.3 million in risk-capitation payments for Medicare Part B services and related administrative costs, an amount that exceeded actual costs by about $25.5 million.

Under the formula in 26 U.S.C. § 9704 for the calculation of the per beneficiary health benefit premiums, one factor is the amount of "reimbursements" received by the plans during the base year. 26 U.S.C. § 9704(b)(2). In calculating this premium, the Secretary used the amount actually paid by the UMWA plans during the base year for Medicare Part B and related administrative costs, or $156.8 million, as "reimbursements" to arrive at an annual per beneficiary premium of $2,245.33 for assigned coal operators. If the Secretary had used the amount received by the UMWA plans from HCFA under the risk-capitation contract, or $182.3 million, as "reimbursements," the per beneficiary premium would have been about $2,013.83.

II. Proceedings Below

In April of 1994, the National Coal Association ("NCA") and eight companies who are assigned premium payment obligations under the Act filed suit in federal district court,[5] alleging that the Secretary violated the Act by miscalculating the health benefit premium. Finding that there were no disputed issues of fact between the parties, the district court addressed the contentions of the parties on cross motions for summary judgment. The court held that the word "reimbursements" in the Act clearly and unambiguously referred to the entire amount of payments made by HCFA to the UMWA plans pursuant to the contract. Because the court held that Congress had precisely addressed the issue before it, the court rejected the Secretary's argument that her interpretation of "reimbursement" was entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court granted the plaintiffs' motion, and ordered the Commissioner to recalculate the health benefit premium using the amount of the risk-capitation payments as "reimbursements." The Commissioner appeals.

III. Issue on Appeal and Standard of Review

The parties to this appeal do not disagree on any issue of fact. The sole issue in this appeal is the meaning of the word "reimbursement" in 26 U.S.C. § 9704(b)(2). This question is one of statutory interpretation, which we review de novo. *United States v. Hansley,* 54 F.3d 709, 717 (11th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 540, 133 L.Ed.2d 444 (1995).

---

[5]Many member companies of the plaintiff National Coal Association are assigned premium payment obligations under the Act. We will refer to the plaintiffs collectively as NCA.

IV. Discussion

The Commissioner contends that her reading of § 9704(b)(2) is compelled by the Act's plain meaning, legislative history, and purpose. According to the Commissioner, the plain meaning of "reimburse" is to indemnify, or pay back, only the amount that will make a party whole. In other words, she argues that reimbursements are necessarily cost-based, and that risk-based capitation payments are only reimbursement to the extent that they do not exceed actual costs. The legislative history supports her reading, she argues, because one of the sponsors of the Act stated that the health benefit premium would be based on "the aggregate amount of payments made and to be made from the 1950 UMWA Benefit Plan and the 1974 UMWA benefit plan for health benefits-less *payments by the plans for Federal program benefits* but including administrative costs—for the [base year]." 138 Cong.Rec. S17634 (daily ed. Oct. 8, 1992) (statement of Sen. Rockefeller) (emphasis added). The Commissioner argues that her reading is more consistent with the Act's purpose of creating a privately financed plan, because it does not allow surplus payments by HCFA to subsidize the operators' contribution to the Combined Fund. Finally, the Commissioner contends that the above arguments demonstrate that hers is a reasonable reading of the statute that is entitled to deference under *Chevron.*

NCA argues that the district court did not err in holding that the plain meaning of "reimbursement" refers to the entire amount of the capitation payments made by HCFA to the UMWA plans during the base year. NCA contends that the Commissioner's reading of the word "reimburse," which excludes an arrangement where a party is

repaid on a capitated basis, is impermissibly restrictive. NCA argues that the agency reading of the statute is not entitled to deference because Congress has spoken to the precise issue in the plain language of the Act.

Any exercise of statutory interpretation begins first with the language of the act. *Bailey v. United States,* --- U.S. ----, ----, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995); *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. Where the intent of Congress is expressed in the text of a statute in reasonably plain terms, we must give effect to that intent. *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). Terms that are not defined in the statute, like the word "reimbursement" in this Act, are given their ordinary or natural meaning. *Federal Deposit Ins. Corp. v. Meyer,* --- U.S. ----, ----, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994).

We hold that the plain meaning of "reimbursement" in § 9704(b)(2) refers to the entire amount of the capitation payments that were made to the UMWA plans as reasonable compensation for Medicare-related expenditures during the base year. "Reimburse" is defined as "to pay back (an equivalent for something taken, lost, or expended) to someone: repay." *Webster's Third New International Dictionary* 1914 (1986). The ordinary meaning of the term "reimbursement" is not restricted by any requirement that such payments be dollar-for-dollar what the reimbursed party paid out.

The district court was correct in reasoning that the legislative history and general purpose of the Act do not overcome its plain statutory language. Although we consider the legislative

history of a statute relevant in the process of interpretation, "we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* --- U.S. ----, ----, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994). Nor can a general appeal to statutory purpose overcome the specific language of the Act, because the text of a statute is the most persuasive evidence of Congress's intent. *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250. Because the statutory text is clear, there is no need to address whether the Commissioner's reading of the statute is entitled to deference under *Chevron.* 467 U.S. at 842-43, 104 S.Ct. at 2781.

The district court correctly held that the Secretary should have included the entire $182.3 million paid to the UMWA plans as "reimbursements."

AFFIRMED.

CLARK, Senior Circuit Judge, Concurring Dubitante:

While I disagree with the holding of the majority, I nevertheless join for reasons which I shall explain. In a nutshell, it would be a disservice in 1996 to reverse a financial arrangement between the parties that has existed since 1993 and the parties have acted thereon. No one gets hurt in the short run if the Combined Fund for which the plaintiffs are partially responsible becomes overpaid.

The majority is correct in adopting from Webster the definition of "reimbursement" to mean "pay back" or "repay," but in my view the opinion tends to err in saying: "The ordinary meaning of the term "reimbursement" is not restricted by any requirement that such payments be dollar-for-dollar what the reimbursed party

paid out." While I would agree such would be the case if the excess reimbursement were *penny ante,* here we are talking about a reimbursement that exceeds twenty-five million dollars.

A report prepared by the majority staff of the House Committee on Ways and Means during the 1994 Term of Congress[1] convinces me that it would be an injustice to go back and try to recalculate the payments from 1993 to present. Although the report shows during the first six months of fiscal year 1995 the Combined Fund operated with a deficit of ten million dollars, the Fund had a surplus of ninety-six million dollars at the end of fiscal year 1994. Further, the report has this statement: "The existence of a surplus in the Combined Benefit Fund of over $100 million has generated considerable interest among the parties responsible for financing the retired miners' health benefits."[2]

From my view, this is a legislative problem, not a judicial one. I have confidence, pursuant to the legislation on the books, that the health benefits of the coal miners are protected. I have just as much confidence that the plaintiff coal mine operators will continue to be treated justly. I hope the taxpayers are equally protected.

This is a case in which to let sleeping dogs lie, and therefore I concur.

---

[1]Staff of House Comm. on Ways and Means, 104th Cong.Sess., *Development and Implementation of the Coal Industry Retiree Health Benefit Act of 1992.* (Comm. Print 1992).

[2]*Id.* at 21-22.