Michael H. HOLLAND, et al., as Trustees of the United Mine Workers of America Combined Benefit Fund, Plaintiffs,

v.

Kenneth S. APFEL, Commissioner, Social Security Administration, Defendant,

and

National Mining Association, et al., Intervenors–Defendants.

Civil Action No. 96–01744 (CKK).

United States District Court, District of Columbia.

Sept. 9, 1998.

Stephen John Pollak, Shea & Gardner, Washington, DC, for Plaintiffs.

Gretchen E. Jacobs, U.S. Department of Justice, Federal Programs Branch, Washington, DC, for Defendant.

John R. Woodrum, Smith, Heenan, Althen & Roles, Washington, DC, for Intevenors–Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

The seven named plaintiffs in the above-captioned case, acting as Trustees of the United Mine Workers of America Combined Benefit Fund ("Trustees"), allege that Kenneth S. Apfel,[1] Commissioner of the Social Security Administration ("Commissioner"), violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by interpreting § 9704(b)(2) of the Coal Industry Retiree Health Benefit Act ("Coal Act") in a manner contrary to law. Both the Commissioner and the Intervenor–Defendants, coal companies that are assigned premium-payment obligations under the Coal Act, have moved to dismiss this action for failure to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). Having carefully re-viewed the parties' well-drafted briefs, controlling law, and the entire record, the Court denies the motions to dismiss.

## I. BACKGROUND

To adjudicate the pending motions to dismiss, a cursory review of the facts will suffice.[2] In 1992, Congress enacted the Coal Act, 26 U.S.C. §§ 9701–9722, to ensure that over 100,000 retired miners would continue to receive health-care benefits. This legislative effort is but the latest chapter in the long and storied history of this nation's coal-mining industry and the labor struggles that it has precipitated. Just recently, the Supreme Court chronicled the more salient events during the past sixty-plus years that culminated in the Coal Act. See Eastern Enterprises v. Apfel, —— U.S. ——, ——–——, 118 S.Ct. 2131, 2137–42, 141 L.Ed.2d 451 (1998). Seeing no need to restate that which the Supreme Court already has documented, the Court simply notes that Congress enacted the Coal Act to "stabilize plan funding and allow for the provision of health care benefits to … retirees." § 19142(a)(2), 106 Stat. 3037, note following 26 U.S.C. § 9701. Congress attempted to achieve this goal by merging two former benefit plans "into a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund (Combined Fund)." Eastern Enterprises, —— U.S. at ——, 118 S.Ct. at 2142 (citing 26 U.S.C. § 9702(a)(1)-(2)). The Combined Fund draws its revenues from "annual premiums assessed against 'signatory coal operators.'" Id.

Although the Coal Act preserved the traditional, privately-financed approach to funding retirees' health-care benefits, Congress assigned an integral role to the Commissioner of Social Security in implementing the substantive promise of the Coal Act.[3] Pursuant

---

1. Pursuant to FED. R. CIV. P. 25(d)(1), Kenneth S. Apfel has been substituted for former Social Security Commissioner Shirley Chater as the Defendant in this litigation.

2. When reviewing a motion to dismiss for failure to state a claim upon which relief may be granted the Court accepts as true all of the factual allegations in the Complaint. See United States v. Gaubert, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)

3. Congress initially vested the Secretary of Health and Human Services with the statutory responsibilities that the Commissioner of Social Security now possesses. See Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, § 108(h)(9)(A), 108 Stat. 1481, 1487.

to § 9704(b)(2), the Commissioner is instructed to calculate a per-beneficiary premium for each plan year. *See* § 9704(b)(2). While the Commissioner enjoys broad power to calculate the premium, Congress has delineated the variables that the Commissioner is to apply in conducting this calculus. Under the Coal Act, the per-beneficiary premium for each plan year is to be equal to the sum of

(A) the amount determined by dividing—

(i) the aggregate amount of payments from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for health benefits (less reimbursements but including administrative costs) for the plan year beginning July 1, 1991, for all individuals covered under such plans for such plan year, by

(ii) the number of such individuals, plus

(B) the amount determined under subparagraph (A) multiplied by the percentage (if any) by which the medical component of the Consumer Price Index for the calendar year in which the plan year begins exceeds such component for 1992.

26 U.S.C. § 9704(b)(2)(A)-(B).

For reasons that warrant no elaborate analysis at this point in the litigation, the Commissioner formerly interpreted the term "reimbursements" in a manner that generated per-beneficiary premiums in an amount favorable to the Trustees. Finding this interpretation at odds with congressional design, several contributing coal companies brought suit under the APA to enjoin the Secretary to adopt a less taxing interpretation of "reimbursement." *See National Coal Ass'n v. Chater*, C.A. No. CV94–H–780–S, 1995 WL 1052240, 1995 U.S. Dist. LEXIS 21125 (N.D. Ala. June 2, 1995) (*"National Coal I"*). The Commissioner initially moved to dismiss the complaint pursuant to FED. R. CIV. P. 19(b) for failure to join the Trustees. The district court, however, denied this motion. On the merits, the district court found that the Commissioner's interpretation of "reimbursement" contradicted the unambiguous meaning of the word as Congress used it. Accordingly, the court issued an injunction that compelled the Commissioner to recalculate the per-beneficiary premium consistent with the interpretation advanced by the coal companies. On appeal, the Eleventh Circuit affirmed. *See National Coal Ass'n v. Chater*, 81 F.3d 1077 (11th Cir.1996) (*"National Coal II"*). The Commissioner did not petition the Supreme Court for a writ of certiorari. Subsequently, the Commissioner announced that the per-beneficiary premium would be calculated according to the Alabama district court injunction.

## II. DISCUSSION

A. *The Trustees, never having participated nor having been joined in the prior Eleventh Circuit litigation, are not barred by res judicata from prosecuting the present action.*

■ According to the venerable common-law doctrine of res judicata, "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see also State of Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1876); *Bank of the United States v. Donnally*, 33 U.S. 361, 370, 8 Pet. 361, 8 L.Ed. 974 (1834). As rich an historical pedigree as the doctrine boasts, it coexists—in tension, at times—with "our 'deep-rooted historic tradition that everyone should have his own day in court.'" *Martin v. Wilks*, 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (quoting 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449, at 417 (1981)). Thus, the general rule that governs federal-court practice is that "[a]judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Id.*

■ Were this general rule an absolute, res judicata obviously would erect no barrier to the Trustees' present action. While the *National Coal I* litigation addressed the very issues that the Trustees seek to litigate in this forum, the Trustees did not participate

in the prior proceedings nor did the coal companies attempt to join the Trustees. The Intervenor–Defendants, however, press into action a footnote from *Martin v. Wilks,* 490 U.S. 755, 762 n. 2, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), to claim that, though absent from all proceedings, the Trustees should be bound by the Eleventh Circuit litigation. Footnote 2 from *Wilks* acknowledged that the general rule that a nonparty is not bound by a judgment reached among other parties is narrowly qualified. As the Court indicated, res judicata may preclude a party from litigating "when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *Wilks,* 490 U.S. at 762 n. 2, 109 S.Ct. 2180. The Intervenors maintain that during the *National Coal I* litigation, the Commissioner adequately represented the Trustees' interests when she defended the very interpretation of "reimbursements" that the Trustees now advance here.

Whatever the scope of the *Wilks*-footnote 2 exception is, by the Supreme Court's own words, it is to be invoked only "in certain limited circumstances." *Id.* Indeed, the Court cited explicitly just two situations in which the exception might apply; neither of which remotely manifests in this case. The first of these "limited circumstances" that the Supreme Court found applicable was the "class" or "representative suits." *See id.* (citing *Hansberry v. Lee,* 311 U.S. 32, 41–42, 61 S.Ct. 115, 85 L.Ed. 22 (1940); FED. R. CIV. P. 23). Yet the lack of any class certification in *National Coal I* plainly removes the litigation from the ambit of Rule 23. Moreover, quite apart from whether the Commissioner shared the same interests as the Trustees, *National Coal I* was not a representative suit as the Supreme Court has used and understood that term. *See Hansberry,* 311 U.S. at 41–42, 61 S.Ct. 115.

The only other "limited circumstance" that the Supreme Court recognized explicitly in *Wilks* was the situation presented by *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In *Montana,* the Court precluded the United States from relitigating an issue decided in a prior proceed-

ing. Although the United States was not a party to the earlier action, it exercised such control over one of the parties that the Court concluded that the United States essentially already had its day in court. Among the factors that demonstrated that the United States "had a sufficient 'laboring oar' in the conduct of the state-court litigation," *id.* at 974, were: the United States (1) required the initial suit to be filed; (2) reviewed and approved the complaint; (3) paid the attorneys' fees and costs; (4) directed the appeal from State District Court to the Montana Supreme Court; (5) appeared and submitted a brief as *amicus* in the Montana Supreme Court; (6) directed the filing of a notice of appeal to this Court; and (7) effectuated abandonment of that appeal on advice of the Solicitor General. *See id.*

In contrast to the pervasive presence and control that the Untied States exercised in *Montana,* the Trustees in *National Coal I* played virtually no role. Conceding that the Trustees "did not exercise the same degree of control over the prior case that the nonparty did in *Montana,*" Intervenors' Mot. to Dismiss at 10, the Intervenors nonetheless argue that the *Montana* exception governs. Yet the Intervenors struggle to marshal any evidence that the Trustees participated actively in *National Coal I.* That the Trustees were "fully aware of the proceedings and the issues presented," Intervenors' Mot. to Dismiss at 10, indicates nothing about whether they played any active role in the case. Indeed, under the Federal Rules of Civil Procedure, simply being "fully aware" of proceedings will not bind a party to an adverse judgment. As the Supreme Court concluded: "Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree." *Wilks,* 490 U.S. at 765, 109 S.Ct. 2180. Nor do the Intervenors fare any better when they note that officials from the Combined Fund provided deposition testimony. What animates the *Montana* decision is a nonparty's control of the litigation, not its mere participation in discrete discovery events. *See* 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE

§ 4451, at 432–33 (1981) ("[I]t is not enough that the nonparty ... testified as a witness; ... undertook some limited presentations to the court; or otherwise participated in a limited way."); *cf. Adams v. Bell,* 711 F.2d 161, 197 n. 128 (D.C.Cir.1983) ("It is clear that appearance as amici does not rise to the level of participation necessary for preclusion."), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984). Finally, the Intervenors intimate that the Trustees should be precluded in this Court because they provided to the Commissioner detailed information that permitted the latter to set the per-beneficiary premium. As the Intervenors' own citation underscores, however, the Trustees operate under congressional mandate to supply information to the Commissioner. *See* 26 U.S.C. § 9704(h) ("The trustees of the Combined Fund shall ... furnish to the Commissioner of Social Security information as to the benefits and covered beneficiaries under the fund, and such other information as the Secretary may require to compute any premium under this section.").

Based on the foregoing, the Trustees' present Complaint does not fall within the four corners of the *Wilks*-footnote 2 exception. Nonetheless, both before and after *Wilks,* the Circuit courts have invoked a theory of "virtual representation" that mirrors substantially the exception that the Supreme Court reduced to a footnote in *Wilks. See, e.g., Gonzalez v. Banco Central Corp.,* 27 F.3d 751, 760–62 (1st Cir.1994); *Gulf Island–IV, Inc. v. Blue Streak–Gulf Is Ops,* 24 F.3d 743, 747 (5th Cir.1994), *cert. denied,* 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1076 (1995); *Pollard v. Cockrell,* 578 F.2d 1002, 1008–09 (5th Cir.1978). *But cf. Ethnic Employees of the Library of Congress v. Boorstin,* 751 F.2d 1405, 1412 n. 8 (D.C.Cir.1985) (declining to take a position on whether the Circuit should adopt an expansive view of virtual representation and noting that "[t]he doctrine of virtual representation has a highly uncertain scope"). Given its initial and most expansive expression in *Aerojet–General Corp. v. Askew,* 511 F.2d 710 (5th Cir.), *appeal dismissed and cert. denied,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975), the doctrine of virtual representation posits that "[u]nder the federal law of res judicata, a

person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Id.* at 719 (citations omitted). Since then, the Fifth Circuit has qualified the doctrine by holding that "[v]irtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues." *Pollard,* 578 F.2d at 1008. As this Circuit has noted, "cases in which courts have based preclusion on virtual representation have involved special factors such as substantial elements of participation in the first litigation, apparent consent to be bound, apparent tactical maneuvering, or close relationships between the parties, such as that between family members." *Ethnic Employees,* 751 F.2d at 1412 n. 8. Despite the murky contours of virtual representation, it is clear that the *National Coal I* litigation does not bar the Trustees here.

The virtual-representation doctrine, however, also illuminates what the Supreme Court may have meant in *Wilks* when it referred to parties that share the "same interests." *Wilks,* 490 U.S. at 762 n. 2, 109 S.Ct. 2180. In cases decided long after *Wilks,* federal courts have held that to preclude a nonparty from relitigating an issue decided in a prior proceeding, the "same interests" must mean something more than that the nonparty and the party are concerned with the same bottom-line result. "This requires more than a showing of parallel interests—it is not enough that the nonparty may be interested in the same questions or proving the same facts." *Gulf Island,* 24 F.3d at 747 (quoting *Eubanks v. F.D.I.C.,* 977 F.2d 166, 170 (5th Cir.1992)); *see also Gonzalez,* 27 F.3d at 760 ("The upshot is that, today, while identity of interests remains a necessary condition for triggering virtual representation, it is not alone a sufficient condition."). Stating the similarity-of-interests requirement in the affirmative, the Second Circuit has held that "[f]or purposes of claim preclusion, the requisite privity must be found in the substantial *identity of incentives* of the earlier party with those of the party against who *res judi-*

*cata* is asserted." *Chase Manhattan Bank v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir.1995) (emphasis added). Lest there be any doubt that similarity of interests is measured by identity of incentives, this Circuit just recently balked at applying the *Wilks* exception because "[t]he CCAGP, by contrast, is not *motivated by the need to save the Board from protracted litigation* .... The interests of the Board and the CCAGP cannot therefore be deemed to have been aligned such that the CCAGP is precluded form challenging the consent decree." *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs*, 142 F.3d 468, 474 (D.C.Cir.1998) (emphasis added).

Here, although the Commissioner and the Trustees both advocated the same interpretation of "reimbursements" in *National Coal I*, the incentives that animated their normative conclusions could not be more different. The Coal Act does not assign to the Commissioner any role as surrogate for the Trustees; he is to act impartially to both the Trustees and the coal companies in calculating the per-beneficiary premium. As the intervenors, themselves, state; "The Commissioner's motivation in the prior case was to protect her power to command judicial deference when implementing statutory responsibilities imposed on her by federal legislation." Intervenors' Mot. to Dismiss at 9. Guided not by administrative zeal, the Trustees are advocates who administer the Combined Fund for the benefit of retirees. As fiduciaries, the Trustees are charged with ensuring the economic vitality of the fund, and derivatively, the health-care needs of thousands of retired mine workers. Whereas the Commissioner lacks any monetary incentive to adopt one interpretation over another, the Trustees have a compelling and palpable interest in advancing an interpretation that will augment the corpus of the Combined Fund by millions of dollars over the coming years. Such disparity of incentives, notwithstanding identity of legal postures, forecloses this Court from invoking res judicata to deny the Trustees their day in court. *See Cleveland County Ass'n for Gov't by the People*, 142 F.3d at 474; *Chase Manhattan*, 56 F.3d at 346; *Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 865 (5th Cir.1985).[4]

B. *That the Commissioner adopted an interpretation of a congressional statute pursuant to a district court injunction does not insulate the interpretation from APA review for action that is "not in accordance with law"*

The APA mandates that a district court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, ·or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Both the Commissioner and the Intervenors advance the rather interesting argument that, as a matter of law, an agency does not act arbitrarily and capriciously when it adopts an interpretation at the behest of a district court injunction. The Trustees do not take issue with this argument. Instead, they assert that, regardless of whether such agency action would be arbitrary or capricious, it nonetheless may violate the APA's "not ·in accordance with law" standard. To this, the Commissioner counters that the "central thrust" of his argument "is that an agency's lawful compliance with an express injunctive order of a federal court cannot, as a matter of law, be deemed to violate *any* aspect of APA

---

4. Based on a quotation taken out of context, the Intervenors suggest that this Circuit concluded in *Frederick County Fruit Growers Ass'n v. Martin*, 968 F.2d 1265 (D.C.Cir.1992), that "the Secretary of Labor was representing the interests of the growers when she defended in a prior case 'the interpretation of the 1978 regulation that the growers now seek an opportunity to advance for themselves.'" Intervenors' Reply at 11 (quoting *Frederick County*, 968 F.2d at 1270). This Circuit made no such finding. The full quotation dramatizes this: "In *NAACP II* the Secretary did initially defend the interpretation of the 1978 regulation that the growers now seek an opportu-

nity to advance for themselves." *Frederick County*, 968 F.2d at 1270. Nowhere in the opinion does the Circuit hold that the Secretary represented the interests of the growers. The Circuit, to be sure, concluded that because the Secretary never appealed the adverse judgment, the growers' interests were not "adequately represented." *Id.* Yet the court never·indicates that had the Secretary appealed the judgment, the growers would have been adequately represented. Thus, the Court does not find that *Frederick County* warrants a different result than the one discussed above.

§ 706(2)(A); such compliance cannot (and does not) constitute agency action that is either 'arbitrary,' 'capricious,' or 'not in accordance with law.'" Commissioner's Reply at 5 (emphasis in original).

Defendants rely primarily on the Supreme Court's decision in *GTE Sylvania, Inc. v. Consumers Union of the U.S., Inc.*, 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980), to support their claim that the Trustees may not impugn the Commissioner's statutory interpretation as contrary to law. In *GTE Sylvania*, several electronics manufacturers successfully sued to enjoin the Consumers Union of the United States, Inc. (CPSC) from releasing certain documents believed to be protected by the Consumer Product Safety Act, 15 U.S.C. § 2055, exemptions to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and by the Trade Secrets Act, 18 U.S.C. § 1905. After the district court issued the injunction, the CPSC received requests pursuant to the FOIA for the documents at issue in the prior litigation. Citing the district court's equitable decree, the CPSC refused to release any documents. The requesters brought suit in this Court under the FOIA, claiming that the agency was improperly withholding documents under 5 U.S.C. § 552(a)(4)(B) (authorizing district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld"). This Circuit held that the previous injunction did not permit the CPSC to withhold the documents without identifying an independent exemption under the FOIA for doing so. *See Consumers Union of United States, Inc. v. Consumer Prod. Safety Comm'n*, 561 F.2d 349, 355 (D.C.Cir. 1977).

The Supreme Court disagreed and reversed. While holding that the district court injunction did insulate the CPSC from a request to produce documents under FOIA, the Supreme Court's rationale is not as transcendent as the Defendants portray it. Importantly, the Court framed the issue to be decided in *GTE Sylvania* as: "[T]he sole question is whether the first requirement, that the information has been 'improperly' withheld, has been satisfied." *GTE Sylva-*

*nia*, 445 U.S. at 384, 100 S.Ct. 1194. Not surprisingly then, the Court devoted the bulk of its analysis to what Congress meant when it adopted the "improperly" withheld standard. *See id.* at 384–86, 100 S.Ct. 1194. After exploring exhaustively the legislative history of the spare term "improperly," the Court concluded that because the district court injunction left "no discretion for the agency to exercise," *id.* at 386, 100 S.Ct. 1194, the CPSC did not "improperly" withhold the documents at issue. The Court, additionally, added a single paragraph to bolster its conclusion that recited the "established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *Id.* at 386, 100 S.Ct. 1194.

■■■ Though by no measure obvious, *GTE Sylvania*'s superficial similarity to this case does not control. It is crucial to recognize at the outset that the Trustees are not pursuing their claim under the "arbitrary or capricious" standard of review. For if they were, their challenge would fail because, as they concede, *see* Pl.'s Opp'n at 24–25, the Commissioner had no discretion to ignore the injunction of the Alabama district court. Where the judicial inquiry looks to whether the agency acted arbitrarily, *GTE Sylvania* plainly holds that an agency cannot abuse its discretion if it had none to exercise. *See GTE Sylvania*, 445 U.S. at 386, 100 S.Ct. 1194.

Unlike the "improperly withheld" standard before the Court in *GTE Sylvania*, however, it is the APA's "not in accordance with law" rubric that governs this Court's review of the Commissioner's interpretation of "reimbursements." This Circuit has long recognized the subtle, yet fundamental differences between arbitrary or capricious review and the APA's "not in accordance with law" standard:

> [*Chevron* analysis], of course, sounds closely akin to plain vanilla arbitrary-and-capricious style review. But it should immediately be made clear that interpreting a statute is quite a different enterprise than policymaking, especially as embodied in rules that have the force of law. Funda-

28

mental differences under the APA turn on that distinction, and the agency is engaged in an analytically distinct function to the extent that it is engaging in an interpretation of the statute .... In short, much of the "arbitrary and capricious" style analysis concerned with reasoned agency decisionmaking ... cannot be applied directly to the question of whether an agency's interpretation of a statute is "contrary to law." It would be inappropriate, therefore, to import wholesale that body of law and apply it in a conceptually distinct arena.

*Continental Air Lines v. Department of Transp.,* 843 F.2d 1444, 1452 (D.C.Cir.1988). Thus, due to the analytically distinct concerns that animate the "arbitrary or capricious" and "not in accordance with law" standards, "there are certainly situations where a challenge to an agency's regulation will fall squarely within one rubric, rather than the other." *Arent v. Shalala,* 70 F.3d 610, 620 (D.C.Cir.1995) (Wald, J., concurring). This is one of those cases.

As it was before the Alabama district court when the coal companies mounted their challenge to the Commissioner's interpretation in *National Coal I,* the task that confronts this court "[i]n determining whether a regulation is 'in accordance with law' [is to] apply the familiar two-part test of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Military Toxics Project v. Environmental Protection Agency,* 146 F.3d 948, 954 (D.C.Cir.1998); *see also National Ass'n of Mfrs. v. United States Dep't of the Interior,* 134 F.3d 1095, 1102 (D.C.Cir.1998) ("[I]t is well-established that when presented with a 'pure question of statutory construction,' a reviewing court's first job is to try to determine congressional intent using 'traditional tools of statutory construction.'" (citations omitted)). Quite distinct from the "improperly withheld" inquiry at issue in *GTE Sylvania* and the garden-variety "arbitrary or capricious" review, "a reviewing court's inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency." *Arent,* 70 F.3d at 615. Put differently, " '[t]he paradigmatic *Chevron*

case concerns the *power of an administrative agency* to administer a congressionally created ... program.'" *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778) (emphasis in original). To resolve the issue, "the question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778).

Because *Chevron* governs whether an agency interpretation is in accordance with law, *see Military Toxics Project,* 146 F.3d at 954, it is essential to determine whether, under *Chevron,* it is relevant that an agency adopted its interpretation pursuant to an otherwise lawful court injunction. It is not. The first and most fundamental inquiry under *Chevron* is whether Congress has "directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. If this question is answered affirmatively, proper respect for the separation of powers commands that "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* The emphasis is appropriately on the intent of Congress, not the courts. This is the keystone of "not in accordance with law" review under *Chevron.*

To adopt the Defendants' argument in this case would be to emasculate the cardinal tenets of administrative law and separation of powers. The Defendants' theory potentially subordinates the unambiguously expressed intent of Congress to the injunctive decree of a single district court and, perhaps, a panel of an appellate court. Such a result turns *Chevron* on its head. For if we were to assume, *arguendo,* that the Eleventh Circuit's decision and the Commissioner's corresponding interpretation contradicted the "unambiguously expressed intent of Congress," under the Defendants' proposal, this Court nonetheless would have to defer to the agency's Article–III blessed interpretation despite its manifest tension with the will of the Article I branch. Neither *GTE Sylvania* nor essential notions of administrative law and

constitution design permits this Court to adopt the Defendants' novel plea.

Not only does the Defendants' proposal improperly subjugate legislative intent to judicial interpretation, it has the curious effect of elevating a lone district or circuit court to the de facto status of the Supreme Court. That is, were administrative agencies able to insulate themselves from APA attacks by cloaking themselves in the injunctive decree of a single court, paramount issues of national importance would be forever determined by just that lone court. While, of course, the losing party could always petition the Supreme Court for certiorari, rarely will that court agree to hear a case before the issue has percolated in the lower courts and has generated a significant split in authority. *See* Sup.Ct. R. 10.1(a). As the Chief Justice has explained:

> [B]orne out time and again in our decisions to grant and deny certiorari, is that ordinarily a court of appeals decision interpreting one of ou ; precedents—even one deemed to be arguably inconsistent with it—will not be reviewed unless it conflicts with a decision of another court of appeals. This fact is a necessary concomitant of the limited capacity in this Court.

*Hubbard v. United States,* 514 U.S. 695, 720, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995) (Rehnquist, C.J., dissenting). Yet, if as a matter of law, no party could challenge an administrative interpretation that was compelled by a court of equity, the law would remain static and immune from circuit disagreements that are the *sine qua non* to Supreme Court review. At bottom, the violence that the Commissioner's and Intervenors' argument would do to constitutional design and structure militate against dismissing this action.

### C. *Comity does not support dismissal*

■ The doctrine of comity does not, as the Intervenors suggest, warrant dismissal. "The case law of this circuit makes it clear that 'comity' is rarely employed to justify the dismissal of viable claims that are otherwise properly before the court." *Northwest Forest Resource Council v. Dombeck,* 107 F.3d 897, 901 (D.C.Cir.1997). Rather, this Circuit has held that, "in strictly limited circumstances ... comity may warrant dismissal of an action where there is a *case pending* in another jurisdiction involving the same parties, issues, and subject matter." *Id.* (emphasis in original). Thus, in *Northwest Forest Resource Council,* the Circuit reversed the district court's comity-based dismissal because, for one thing, the case involved "at least some parties not before the court" in the prior proceedings. *Id.* Moreover, the earlier proceedings "were no longer pending when the dismissal was ordered." *Id.*

■ Here, as in *Northwest Forest Resource Council,* one of the parties to the present litigation never appeared before the first district court. This case also shares with *Northwest Forest Resource Council* the fact that the prior litigation has long since concluded. Under these circumstances, comity's twin pillars, "to assure judicial efficiency and to reflect abiding respect for other courts," are wholly absent from this case. *See Consumers Union of U.S., Inc. v. Consumer Prod. Safety Comm'n,* 590 F.2d 1209, 1219 (D.C.Cir.1978) (footnote omitted), *rev'd on other grounds sub. nom GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.,* 445 U.S. 375, 384–87, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980). Accordingly, the Court denies the motion to dismiss based on principles of comity.[5]

### III. CONCLUSION

For the foregoing reasons, the Court denies the motions to dismiss filed by the Commissioner and the Intervenors.

---

5. The Commissioner fears that were this Court to enter judgment in favor of the Trustees, he would be forced to navigate the narrow compass between obeying the Scilla of this Court's Order and the Charybdis of the Eleventh Circuit's injunction. Such concerns are misplaced. The Trustees have proposed that this Court either stay whatever equitable decree it might issue pending appeal or simply grant declaratory relief. *See* Pl.'s Opp'n at 41. By their own concession, "[b]oth options provide the Trustees with an avenue to meaningful relief." Because the Trustees have voluntarily limited their prayer for relief to these options, the dilemma that the Commissioner raises need not be addressed beyond what has been said here.