TRAXLER, Circuit Judge,
dissenting:
Respectfully, I agree with the Court of Appeals for the District of Columbia Circuit that the term “reimbursements,” a component of the “per beneficiary premium” formula prescribed by the Coal Act in § 9704(b)(2), is not clear and unambiguous. See Holland v. National Mining Ass’n, 309 F.3d 808, 816 (D.C.Cir.2002). Although I am inclined to agree that the Commissioner’s interpretation is not entitled to deference under the framework of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I would nevertheless sustain the Commissioner’s use of an actual-cost basis for reimbursements in determining the per beneficiary premium to be paid by coal companies (“coal operators”), rather than the risk-capitation basis which resulted in a $25.5 million windfall of sorts to the coal operators. Accordingly, I would reverse the decision of the district court.
The Coal Act, in order to finance benefits provided by the Combined Fund, mandates the payment of an annual premium by each coal operator. See 26 U.S.C. § 9704(a). One component of this annual premium is a “health benefit premium,” 26 U.S.C. § 9704(a)(1), which is determined by multiplying a standard “per beneficiary premium” by “the number of eligible beneficiaries assigned [by the Commissioner] to [a given coal] operator under section 9706,” 26 U.S.C. § 9704(b)(1).
In turn, the “per beneficiary premium” is calculated annually by the Commissioner according to a statutorily prescribed formula. See 26 U.S.C. § 9704(b)(2). In simple terms, the per beneficiary premium reflects the average cost to the UMWA *171 Benefit Plans of health benefits for an individual beneficiary during the Coal Act’s “base year” — 1991, the final year before the 1950 and 1974 Benefit Plans merged under the Coal Act to become the Combined Fund. See 26 U.S.C. § 9704(b)(2)(A); Holland, 309 F.3d at 811.*
Significantly, the statutory formula for determining this average cost of individual health benefits during the 1991 base year excludes “reimbursements” from the calculation: The per beneficiary premium is “the aggregate amount of payments from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for health benefits (less reimbursements but including administrative costs) for the plan year beginning July 1, 1991, for all individuals covered under such plans for such plan year,” divided by the number of eligible beneficiaries that year. See 26 U.S.C. § 9704(b)(2)(A)® and (ii) (emphasis added). The treatment of “reimbursements” ensures that the baseline per beneficiary premium reflects the average cost of only those benefits covered by the UMWA Benefit Plans. To avoid overlap with federal benefit programs, the UMWA Benefit Plans did not provide benefits for services covered by such programs — most notably Medicare. See National Coal Ass’n v. Chater, 81 F.3d 1077, 1079 (11th Cir.1996) (per curiam). For the convenience of the beneficiaries of the UMWA Benefit Plans, however, the Plans followed an administrative practice of paying health care providers for all services rendered, even if such services were covered by Medicare or another government program and not by the UMWA Benefit Plans. The Plans then sought repayment for any such services, thus relieving the individual beneficiaries of the burden of seeking payment from multiple benefit plans. See Holland, 309 F.3d at 811; National Coal Ass’n, 81 F.3d at 1079. Thus, the formula set forth in section 9704(b)(2) is designed so that Medicare and other government benefits not covered by the UMWA Benefit Plans would not skew the average cost of UMWA benefits during the base year as a result of the Plans’ efficient administrative practices.
The parties’ competing interpretations of “reimbursements” are rooted in the pre-Coal Act administrative practices of the UMWA Benefit Plans. Prior to 1990, the UMWA Benefit Plans presented claims for reimbursement based on covered Medicare services actually received by Plan beneficiaries and paid for by the Plans. See National Coal Ass’n, 81 F.3d at 1080; Holland, 309 F.3d at 811. This cost-based method of reimbursement, however, produced ongoing disputes over covered services and reimbursement amounts. In 1990, the parties adopted a different practice, entering into a “risk capitation” agreement under which Medicare paid the UMWA Benefit Plans a predetermined monthly flat fee based on projected Medicare expenditures. See National Coal Ass’n, 81 F.3d at 1080; Holland, 309 F.3d at 811. As it turned out, the projected expenses (resulting in the payment of a $182.3 million flat fee to the Plans) exceeded actual costs during the base year ($156.8 million) by $25.5 million. See Holland, 309 F.3d at 811.
The Coal Act does not define the term “reimbursements.” For undefined statutory terms, courts accord them “their ordinary meaning.” Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); Schlossberg v. *172 Barney, 380 F.3d 174, 180 (4th Cir.2004) (“In the absence of expressed Congressional intent, we must assume that Congress intended to convey the language’s ordinary meaning.” (internal quotation marks omitted)). The parties emphasize different aspects of the same dictionary definitions to support their readings of the text as most faithful to the ordinary meaning of the words. Appellants emphasize the notion of equivalency — that “to reimburse” is “to pay back (an equivalent for something taken, lost or expended) to someone: [r]epay” or “to make restoration or payment of an equivalent ... :[i]ndemnify.” Webster’s Third New International Dictionary 1914 (1981); see Holland, 309 F.3d at 816. The coal operators, by contrast, contend that “reimburse” in the “repayment of an equivalent” sense is not necessarily limited to repayment on a dollar-for-dollar basis. See National Coal Ass’n, 81 F.3d at 1082. For example, they suggest expenses may be “reimbursed” on a per diem basis where the fixed per diem amount serves as the “equivalent” of the expenditures.
In this instance, as suggested by the split between the circuit courts of appeal, the “ordinary meaning” approach is not helpful in determining congressional intent as to the meaning of “reimbursement.” Because either reading is plausible on its face, I find the statute ambiguous. Compare Holland, 309 F.3d at 816 (“The Eleventh Circuit’s analysis is somewhat perplexing, because it acknowledges that reimburse means to pay back an equivalent for something expended ..., and yet the opinion concludes that reimbursement is not restricted dollar-for-dollar [to] what the reimbursed party payed out. If anything, the Eleventh Circuit’s opinion seems to confirm the statute’s ambiguity.”) (internal quotation marks omitted) with National Coal Ass’n, 81 F.3d at 1082 (concluding, based on the dictionary definition, that the statutory text unambiguously refers to “the entire amount of the capitation payments that were made to the UMWA plans”).
Looking beyond the Webster’s definition of “reimburse,” the coal operators argue that the statute is unambiguous because the “per beneficiary formula” uses 1991 as a base year, and Congress was aware that a risk-capitation arrangement was in effect in 1991. In support of this argument for an unambiguous text, the coal operators offer legislative history and other extrinsic materials to demonstrate that the UMWA Benefit Plans and Medicare had agreed to handle the actual-cost dilemma via the capitation agreement. In my view, legislative history cannot be used to establish the plainness of the statutory text, see United States v. Gonzales, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), and it probably ought not be used, as the coal operators do here, to “confirm” the meaning of a statute if the statute is indeed unambiguous, see Zedner v. United States, — U.S. -, -, 126 S.Ct. 1976, 1991, 164 L.Ed.2d 749 (2006) (Scalia, J., concurring) (“[I]f legislative history is relevant when it confirms the plain meaning of the statutory text, it should also be relevant when it contradicts the plain meaning, thus rendering what is plain ambiguous.”). The statutory text is quite clearly the best evidence of congressional intent and, therefore, judicial inquiry ends with the conclusion that the statute is clear and unambiguous. See Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). In sum, a statute’s clarity, or lack thereof, cannot be discovered from extrinsic sources — such materials become useful only after it becomes apparent that the statute itself is unclear or ambiguous. See Exxon Mobil Corp. v. *173 Allapattah Servs., Inc., 545 U.S. 546, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005).
But beyond that, I do not find the legislative history terribly helpful in deciphering congressional intent. The report of the Coal Commission is the primary source of legislative history offered by the coal operators, and it indeed references “capi-tated reimbursement” in explaining the current state of affairs in the coal industry’s pre-Coal Act health benefit system. Since the report does not represent the understanding of Congress as a whole, these references do not necessarily mean that Congress meant “capitated reimbursement” when it merely said “reimbursement.” In fact, I cannot be sure of the more basic premise that the Coal Commission’s report establishes that Congress was “aware” that, in 1991 in this specialized context, “reimbursement” carried a specialized meaning. Indeed, as the Trustees point out, the principal sponsor of the Act, Senator Rockefeller, suggested “reimbursements” meant “payments by the plans for Federal program benefits.” 138 Cong. Rec. 34034. Of course, the statement of an individual senator is obviously not controlling evidence of congressional intent, but it highlights the generally ambiguous nature of legislative history. Nor do I find the private parties’ understanding of the capitation arrangement relevant to congressional intent. In sum, these extra-textual sources offered by the coal operators do not indicate that Congress was referring in section 9704(b)(2)(A)(i) to all payments made pursuant to the capitation agreement.
The text on its face directs the Commissioner to calculate the per beneficiary premium using base year, or 1991, figures— meaning that the Commissioner would simply gather and plug in historical data about reimbursements received in 1991. Viewed in light of the text and the purpose of the statute itself, however, I cannot conclude that Congress thought of this fixed capitation arrangement, which produced a $25 million overpayment from Medicare, as a “reimbursement.” Indeed, the Coal Act suggests the opposite. The per beneficiary premium is based on the average cost of Plan benefits to a coal operator. It would be a curious approach for Congress to attempt to achieve such a result by directing that capitation payments far removed from actual costs be used. Moreover, the coal operators’ preferred interpretation would run contrary to a fundamental purpose of the Coal Act: to continue private funding of the UMWA Benefit Plans. Instead of burdening the public fisc with the coal operators’ obligation to continue providing benefits to retired miners, Congress sought “to provide for the continuation of a privately financed self-sufficient program for the delivery of health benefits to the beneficiaries of such plans.” Pub.L. No. 102-486, § 19142(b)(3); cf. Shenango Inc. v. Apfel, 307 F.3d 174, 195 (3d Cir.2002) (“In short, the Coal Act’s key objective is to ensure that the costs of providing retirement benefits will, so far as possible, be borne by the private parties most responsible for creating retired miners’ expectations of lifetime health benefits.”).
Based on the foregoing, I view the statute as ambiguous and would so hold. I agree, however, that Chevron deference is not applicable to the Commissioner’s decision in this instance. Ordinarily, the next step would be to consider whether the agency decision is entitled, based on its power to persuade, to “deference” under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Because the position ultimately adopted by the Commissioner is the position I would adopt if I were construing the statute from scratch, I would reverse regardless of whether Skid-more deference is appropriate. See Edel- *174 man v. Lynchburg College, 535 U.S. 106, 114 & n. 8, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002). As noted, the construction advanced by the coal operators runs contrary to a primary purpose of the Coal Act to ensure the continued private-financing of health benefits for retired miners. In effect, the $25.5 million overpayment to the UMWA Benefit Plans resulted in a windfall for the coal operators and shifted some of the burden of paying for benefits under the Coal Act from private entities to Medicare. Accordingly, in the absence of clear and unambiguous statutory language, and without definitive legislative history to clear up the statute, I would read the word “reimbursement” consistently with the express purposes of the Coal Act and affirm the Commissioner’s application of the per beneficiary premium under section 9704(b) (2) (A) (i).

 The Coal Act directs the Commissioner to adjust this baseline amount for inflation each year. See 26 U.S.C. § 9704(b)(2)(B); The Pittston Co. v. United States, 199 F.3d 694, 699 (4th Cir.1999).