**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL H. HOLLAND; MARTY D.
HUDSON; ELLIOT A. SEGAL; A. FRANK
DUNHAM, as Trustees of the UNITED
MINE WORKERS OF AMERICA 1992
BENEFIT PLAN,
Plaintiffs-Appellees,

v.

BIG RIVER MINERALS CORPORATION;
BIG RIVER COAL CORPORATION; PEA
RIDGE IRON ORE COMPANY,
INCORPORATED; OXIDE SERVICES
CORPORATION; CASTLE ROCK MINING
COMPANY; CASTLE ROCK COAL
CORPORATION; LONG BRANCH ENERGY
CORPORATION; PINNACLE ROCK COAL

No. 98-2353

CORPORATION; PANTHER BRANCH
COAL COMPANY, d/b/a Long Branch
Energy; BIRCHFIELD MINING,
INCORPORATED; DAVIDSON MINING,
INCORPORATED; M.A.E.-WEST,
INCORPORATED,
Defendants-Appellants,

v.

MICHAEL H. HOLLAND; MICHAEL O.
MCKOWN; DONALD E. PIERCE, JR.;
ELLIOT A. SEGAL, Trustees of the
United Mine Workers of America
1993 Benefit Plan,
Third Party Defendants-
Appellees.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Dennis Raymond Knapp, Senior District Judge.
(CA-97-138-2)

Argued: April 7, 1999

Decided: June 23, 1999

Before WIDENER, MURNAGHAN, and WILKINS, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Wilkins wrote the opinion, in which Judge Widener and Judge
Murnaghan joined.

_____

**COUNSEL**

**ARGUED:** Charles Leslie Woody, SPILMAN, THOMAS & BAT-
TLE, P.L.L.C., Charleston, West Virginia; David J. Laurent, POLITO
& SMOCK, P.C., Pittsburgh, Pennsylvania, for Appellants. Marilyn
Louise Baker, MOONEY, GREEN, BAKER, GIBSON & SAIN-
DON, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Elizabeth
A. Saindon, Joseph R. House, MOONEY, GREEN, BAKER, GIB-
SON & SAINDON, P.C., Washington, D.C.; Peter Buscemi, MOR-
GAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; David W.
Allen, Brian H. Benjet, Office of the General Counsel, UMWA
HEALTH AND RETIREMENT FUNDS, Washington, D.C., for
Appellees.

_____

**OPINION**

WILKINS, Circuit Judge:

The Trustees of the United Mine Workers of America 1992 Benefit

2

Plan (the "Trustees") brought this action against Coal Companies[1] under the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), see 26 U.S.C.A. §§ 9701-22 (West Supp. 1999), claiming that they were liable for the health benefits of 11 former miners who retired due to disabilities as well as the health benefits of their dependents. The district court granted summary judgment in favor of the Trustees. The court subsequently entered a judgment directing Coal Companies to fund the health benefits in the future and to reimburse the Trustees for health benefits previously provided by the 1992 UMWA Benefit Plan, awarding attorney's fees to the Trustees, and imposing an increased prefunding requirement on Coal Companies. Thereafter, the district court denied a motion by Defendants Pea Ridge Iron Ore Company, Inc. (Pea Ridge) and Oxide Services Corporation (Oxide) for reconsideration, see Fed. R. Civ. P. 59, which relied on Eastern Enterprises v. Apfel, 118 S. Ct. 2131 (1998), to argue that 26 U.S.C.A. § 9712(d)(4) of the Coal Act was unconstitutional under the Fifth Amendment as applied to them. Because we conclude that the district court correctly determined that the disabled retirees are eligible beneficiaries under the Coal Act, that Pea Ridge and Oxide waived their constitutional challenge to the Coal Act, and that the award of attorney's fees was appropriate, we affirm the rulings of the district court on these issues. However, we hold that the district court erred in imposing the increased prefunding requirement. We therefore vacate that portion of the judgment.

_____

[1] We refer to Defendants collectively as "Coal Companies." There are two groups of Coal Companies involved as defendants. The first group-- Birchfield Mining, Inc., Davidson Mining, Inc., and M.A.E.-West, Inc.-- were signatories to collective bargaining agreements providing health benefits for the retired miners at issue. The remaining Coal Companies-- Big River Minerals Corporation, Big River Coal Corporation, Pea Ridge Iron Ore Company, Inc., Oxide Services Corporation, Castle Rock Mining Company, Castle Rock Coal Corporation, Long Branch Energy Corporation, Pinnacle Rock Coal Corporation, and Panther Branch Coal Company--are related to the signatory companies and thus are jointly and severally liable for any amounts required to be paid by the signatory company under the Coal Act. See 26 U.S.C.A.§ 9712(d)(4) (West Supp. 1999).

3

I.

The issue of health care benefits for retired coal industry workers and their dependents has a protracted history. See generally Eastern Enters., 118 S. Ct. at 2137-42 (plurality opinion) (discussing history leading to the enactment of the Coal Act); id. at 2165-66 (Breyer, J., dissenting) (same); Holland v. Keenan Trucking Co., 102 F.3d 736, 738-39 (4th Cir. 1996) (same). Disputes concerning health care for miners date back to the time early in this century when such care was funded with a prepayment plan through payroll deductions and was supplied by company doctors. In the 1930s and 1940s the United Mine Workers of America (UMWA) and coal industry employers sought changes in the method of providing essential services to miners, and from the late 1940s through the early 1970s pension and medical benefits were provided by several UMWA funds created under a series of National Bituminous Coal Wage Agreements (NBCWAs), including a 1950 and a 1974 UMWA Benefit Plan. The funding for these benefits was supplied in part by a royalty on each ton of coal mined and by payroll deductions. As benefits improved under UMWA plans and the number of beneficiaries increased, other factors such as a decrease in the amount of coal produced and a rapid increase in health care costs conspired to produce financial problems for the funds. In response to these financial pressures, the 1978 NBCWA allocated to signatory employers responsibility for the health care costs of their active and retired miners. The 1974 UMWA Benefit Plan remained in place, but was responsible for providing benefits only to "orphaned" retired miners--those whose former employers were no longer in business. Additionally, signatory operators under the 1978 NBCWA became liable for defined benefits to miners rather than merely for specified contributions of royalties.

Despite this restructuring, the benefit plans continued to suffer financially, and by the late 1980s they were facing insolvency. Unrest concerning this situation led to an 11-month strike beginning in 1989 by mine workers against the Pittston Coal Company, which ended only after the Secretary of Labor intervened and negotiated a settlement. Thereafter, the Secretary established the Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission"), a bipartisan commission formed to assess the financial outlook of the UMWA health benefit plans and to devise

4

possible plans to guarantee their long-term viability. The Coal Commission concluded that retired miners were entitled to the health benefits that had been promised them and that such commitments must be honored; that a statutory obligation to fund the benefits should be imposed on current and former signatories to NBCWAs; and that some means of funding benefits for orphaned miners must be developed. After conducting hearings on the Coal Commission's recommendations, Congress enacted the Coal Act. Congress found:

> [I]n order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

26 U.S.C.A. § 9701 note.

Toward these goals, the Coal Act legislated three significant changes in health benefits for retired coal workers. First, it consolidated the 1950 and 1974 UMWA Benefit Plans into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). See 26 U.S.C.A. § 9702(a)(2). The Combined Fund provides health and death benefits to coal industry retirees who, as of July 20, 1992, were eligible to receive and were receiving benefits from the 1950 or 1974 UMWA Benefit Plans and to those receiving or eligible to receive such benefits as of such date by virtue of a relationship to such a retiree. See 26 U.S.C.A. § 9703. Second, the Coal Act mandated the continuance of individual employer plans maintained by signatories to the 1978 (and subsequent) NBCWAs; these plans provide health coverage for retirees who were receiving or were eligible to receive retiree benefits as of February 1, 1993 and retired on or before September 30, 1994 and their survivors and dependents. See 26 U.S.C.A. § 9711(a)-(b). Third, the Coal Act established the 1992 UMWA Benefit Plan to provide health benefits to retirees who were eligible for but not receiving benefits under the 1950 or 1974 UMWA Benefit Plans and to retirees who, although eligible for coverage under § 9711(b), are not receiving benefits from an individual employer plan. See 26 U.S.C.A. § 9712. Benefits paid by the 1992 UMWA Benefit Plan are funded through premiums paid by the "1988

5

last signatory operators." Id. § 9712(d)(1). The term "1988 last signatory operator," generally speaking, refers to a coal operator who signed the 1988 NBCWA and was the most recent coal industry employer of a coal industry retiree. 26 U.S.C.A.§§ 9701(c)(1), (3), (4), 9712(d)(6). Each affected coal operator is required to pay annual and monthly premiums to the 1992 UMWA Benefit Plan and to provide security for the projected cost of covering eligible beneficiaries. See 26 U.S.C.A. § 9712(d)(1).

In order to ensure that coal operators would not be able to avoid their obligations to the 1992 UMWA Benefit Plan, Congress provided that "any related person" to an operator obligated to make payments to the 1992 UMWA Benefit Plan would be jointly and severally liable for those obligations. 26 U.S.C.A. § 9712(d)(4). The term "related person" is defined broadly to include a coal operator's individual partners and corporate affiliates and other trades or businesses controlled by a coal operator's principal shareholder or corporate parent. 26 U.S.C.A. § 9701(c)(2); see also 26 U.S.C.A. §§ 52, 1563(a) (West Supp. 1999).

Section 9712(b) establishes the coverage requirements for the 1992 UMWA Benefit Plan. It provides in pertinent part:

> Eligible beneficiary.--For purposes of this section, the term "eligible beneficiary" means an individual who--
>
> (A) but for the enactment of this chapter, would be eligible to receive benefits from the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, based upon age and service earned as of February 1, 1993; or
>
> (B) with respect to whom coverage is required to be provided under section 9711, but who does not receive such coverage from the applicable last signatory operator or any related person,
>
> and any individual who is eligible for benefits by reason of a relationship to an individual described in subparagraph (A)

6

or (B). In no event shall the 1992 UMWA Benefit Plan provide health benefits coverage to any eligible beneficiary who is a coal industry retiree who retired from the coal industry after September 30, 1994, or any beneficiary of such individual.

26 U.S.C.A. § 9712(b)(2). Section 9711(b) in turn provides in pertinent part:

The last signatory operator of any individual who, as of February 1, 1993, is not receiving retiree health benefits under the individual employer plan maintained by the last signatory operator pursuant to a 1978 or subsequent coal wage agreement, but has met the age and service requirements for eligibility to receive benefits under such plan as of such date, shall, at such time as such individual becomes eligible to receive benefits under such plan, provide health benefits coverage to such individual and the individual's eligible beneficiaries which is described in paragraph (2). This paragraph shall not apply to any individual who retired from the coal industry after September 30, 1994, or any eligible beneficiary of such individual.

26 U.S.C.A. § 9711(b)(1).

The Trustees brought this action claiming that Coal Companies are liable to fund health benefits under § 9711 or § 9712 for a group of 11 miners, who retired due to disabilities, and their dependents. Coal Companies, on the other hand, asserted that miners who have retired due to a disability are not individuals who have "met the age and service requirements for eligibility to receive" retirement benefits under an individual employer plan maintained by the last signatory operator of a 1978 or subsequent NBCWA, 26 U.S.C.A. § 9711(b)(1), and do not fit the definition of an "eligible beneficiary" because their eligibility to receive benefits from the 1950 or 1974 UMWA Benefit Plan is not "based upon age and service" requirements, 26 U.S.C.A. § 9712(b)(2). Alternatively, Coal Companies maintained that even assuming the 11 miners in question met the age and service requirements, they nevertheless were not entitled to benefits because they did

7

not apply for retirement benefits prior to September 30, 1994 and thus had not retired by that date.

II.

A.

The first question presented is whether Coal Companies are liable under § 9711(b)(1) and § 9712(b)(2) for health benefits of coal workers who meet the eligibility requirements for benefits under individual employer plans created pursuant to 1978 or subsequent NBCWAs or the 1950 or 1974 UMWA Benefit Plans only by reason of their disability. Coal Companies contend that disability retirees are not covered because they neither (1) qualify as individuals who are eligible to receive benefits under 1978 or subsequent NBCWA agreements because they "met the age and service requirements for eligibility to receive benefits under such plan," 26 U.S.C.A.§ 9711(b)(1), nor (2) satisfy the definition of "[e]ligible beneficiar[ies]" in that they did not become eligible for benefits "based upon age and service earned as of February 1, 1993," 26 U.S.C.A. § 9712(b)(2)(A).

Statutory interpretation necessarily begins with an analysis of the language of the statute. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985). And, in analyzing the meaning of a statute, we must first "determine whether the language at issue has a plain and unambiguous meaning." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). Our determination of whether a statute is ambiguous is guided "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341. If the language is plain and "the statutory scheme is coherent and consistent," we need not inquire further. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240-41 (1989)."[T]he sole function of the courts is to enforce [the statute] according to its terms." Caminetti v. United States, 242 U.S. 470, 485 (1917).**2** If the statutory

_____

**2** Therefore, courts should venture beyond the plain meaning of the statute only in those rare instances in which there is"a clearly expressed legislative intent to the contrary," Russello v. United States, 464 U.S. 16, 20 (1983) (internal quotation marks omitted), in which a literal application of the statute would thwart its obvious purpose, see Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982), or in which a literal application of the statute would produce an absurd result, see United States v. American Trucking Ass'ns, 310 U.S. 534, 543 (1940).

8

language is ambiguous, we "look beyond the language of the statute to the legislative history for guidance." Stiltner v.Beretta U.S.A. Corp., 74 F.3d 1473, 1482 (4th Cir. 1996) (en banc). If congressional intent is not apparent from an examination of "the legislative history, we apply the traditional tools of statutory construction." Id.

Coal Companies first maintain that disability retirees satisfy the requirements of neither § 9711(b)(1) nor § 9712(b)(2) because these statutes require eligibility for benefits to be based upon "age and service" earned rather than a disability. In support of this contention, Coal Companies argue that § 9711(b)(1) applies only to individuals who are eligible for benefits under an individual employer plan created by a 1978 or subsequent NBCWA when those individuals have "met the age and service requirements for eligibility." Further, Coal Companies assert that the statutory definition of an"eligible beneficiary" in § 9712(b)(2) requires that a retiree's eligibility to receive benefits from the 1950 or 1974 UMWA Benefit Plans be"based upon" his having satisfied age and service requirements. The Trustees, on the other hand, assert that Coal Companies' reading of the statutes is too strict. The Trustees contend that the references to age and service earned as of February 1, 1993 in § 9711(b)(1) and § 9712(b)(2) were meant to establish only the date after which retirees would not qualify for Coal Act benefits. The reference to age and service requirements does not disqualify disabled retirees, according to the Trustees, because retirees who were disabled prior to February 1, 1993 met all age and service requirements that applied to them, i.e., none.

In our view, the statutory language is reasonably susceptible to either of these two interpretations. See Robinson, 519 U.S. at 342 (holding statute is ambiguous where it "could just as easily be read to" have one meaning as another); Adler v. Commissioner, 86 F.3d 378, 380 (4th Cir. 1996) (holding statute ambiguous because it was reasonably susceptible to multiple meanings). And, having determined that these provisions are ambiguous, we look to the purpose of the Coal Act, as revealed in the legislative history, to resolve their meaning. See id. at 380-81 (explaining "that we best implement the intent of Congress by construing the statute in a way that gives effect to its purpose"); Andrews v. Riggs Nat'l Bank of Washington, D.C. (In re Andrews), 80 F.3d 906, 909 (4th Cir. 1996) (recognizing that if

9

statutory language is ambiguous, this court will "give it the meaning most consistent with the statute's purpose"). The historical background leading to the enactment of the Coal Act makes clear that Congress intended to provide coal industry retirees with the lifetime benefits they had been promised. Since coal workers had been promised health benefits in the event of their retirement, whether that retirement resulted from a disability or was based solely on their satisfaction of age and service requirements, we conclude that Congress intended that coal industry workers who retired as a result of a disability would be eligible for benefits under § 9711(b)(1) and § 9712(b)(2). See Eastern Enters., 118 S. Ct. at 2140-42 (plurality opinion) (discussing legislative history); id. at 2166 (Breyer, J., dissenting) (same).

B.

Coal Companies contend alternatively that even if disability retirees may be eligible for benefits under § 9711(b)(1) and § 9712(b)(2), those provisions limit benefits to coal workers who actually filed an application for pension benefits by September 30, 1994. See 26 U.S.C.A. § 9711(b)(1) ("This paragraph shall not apply to any individual who retired from the coal industry after September 30, 1994, or any eligible beneficiary of such an individual."); 26 U.S.C.A. § 9712(b)(2) ("In no event shall the 1992 UMWA Benefit Plan provide health benefits coverage to any eligible beneficiary who is a coal industry retiree who retired from the coal industry after September 30, 1994, or any beneficiary of such individual"). Since the 11 miners at issue here did not file an application for pension benefits before September 30, 1994, Coal Companies argue, the miners are not entitled to benefits. We disagree.

The plain meaning of the word "retired" is "withdrawn from or no longer occupied with one's business or profession." The Random House College Dictionary 1127 (rev. ed. 1980). The plain meaning of the word "retired," therefore, does not encompass only those individuals who receive, or have applied for, pension benefits. Thus, we reject Coal Companies' argument that only those individuals who filed applications for retirement benefits as of September 30, 1994 are eligible for coverage under § 9711(b)(1) and § 9712(b)(2).

10

C.

In sum, we find § 9711(b)(1) and § 9712(b)(2) to be ambiguous and construe them to have a meaning consistent with the purpose of the Coal Act--to provide lifetime health benefits for retiring miners who had been promised such benefits under the prior labor agreements. Therefore, we conclude that disabled retirees are included among the individuals covered under § 9711(b)(1) and § 9712(b)(2). In addition, we hold that not only those individuals who have filed applications for retirement benefits by September 30, 1994 are eligible for coverage under § 9711(b)(1) and § 9712(b)(2).

III.

Pea Ridge and Oxide, two "related" coal companies--i.e., ones that were not signatories to a prior agreement establishing a benefit plan but that are members of the control group of a signatory company-- claim that holding them responsible for contributions to the 1992 UMWA Benefit Plan constitutes a violation of due process and a taking in violation of the Fifth Amendment because they never employed covered miners and were not within the control group when the miners were employed.

As a threshold matter, we must determine whether this issue is properly before the court. Generally, issues that were not raised in the district court will not be addressed on appeal. See Singleton v. Wulff, 428 U.S. 106, 120 (1976); Muth v. United States , 1 F.3d 246, 250 (4th Cir. 1993) (explaining that issues not raised in district court will not be considered on appeal unless the "refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice"); United States v. One 1971 Mercedes Benz 2-Door Coupe, 542 F.2d 912, 915 (4th Cir. 1976) (explaining that the failure to raise and preserve issue in district court waives consideration of that issue on appeal absent exceptional circumstances); see also United States v. Dickerson, 166 F.3d at 667, 683 (4th Cir. 1999) (recognizing that this court may address issue not raised below in exceptional circumstances). And, an issue presented for the first time in a motion pursuant to Federal Rule of Civil Procedure 59(e) generally is not timely raised; accordingly, such an issue is not preserved for appellate review unless the district court exercises its discretion to

11

excuse the party's lack of timeliness and consider the issue. See Quest Med., Inc. v. Apprill, 90 F.3d 1080, 1087 (5th Cir. 1996) (noting that although courts generally look with disfavor on arguments presented for first time post-trial, district court possesses the discretion to entertain such arguments and if it excuses the default and addresses the merits, the issue is properly preserved for appellate review); see also Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co. , 124 F.3d 508, 519 n.12 (3d Cir. 1997) (declining to consider on appeal issue raised for first time in party's Rule 59(e) motion); Jorge Rivera Surillo & Co. v. Falconer Glass Indus., 37 F.3d 25, 29 (1st Cir. 1994) (dismissing arguments raised for first time in Rule 59(e) motion and not addressed on merits by district court as not properly before the appellate court); Havoco of Am., Ltd. v. Sumitomo Corp. of Am., 971 F.2d 1332, 1336 (7th Cir. 1992) (stating that arguments that could and should have been made prior to judgment may not be raised for first time in Rule 59(e) motion); cf. 389 Orange St. Partners v. Arnold, 170 F.3d 1200, 1207 (9th Cir. 1999) (explaining that a district court does not abuse its discretion in "declining to address an issue raised for the first time in a motion for reconsideration"). But cf. Lawson v. Singletary, 85 F.3d 502, 507 (11th Cir. 1996) (per curiam) (concluding that district court abused its discretion in failing to consider issue raised for first time in Rule 59(e) motion).

Pea Ridge and Oxide recognize that they failed to raise their constitutional arguments until their Rule 59(e) motion for reconsideration following the final decision in district court. Nevertheless, they assert that their failure to pursue the issue timely does not constitute a waiver of the constitutional argument because they satisfy an exception to the general rule of waiver. Such an exception exists, they correctly explain, when there has been an intervening change in the law recognizing an issue that was not previously available. See Curtis Publ'g Co. v. Butts, 388 U.S. 130, 142-45 (1967) (plurality opinion); Holzsager v. Valley Hosp., 646 F.2d 792, 796 (2d Cir. 1981); see also Pacific Ins. Co. v. American Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (explaining that although a Rule 59(e) motion may be granted based on, inter alia, "an intervening change in controlling law," such "motions may not be used ... to raise arguments which could have been raised prior to the issuance of the judgment ... [or] to argue a case under a novel legal theory that the party had the ability to address in the first instance"), cert. denied, 119 S. Ct. 869 (1999).

12

The intervening law exception to the general rule that the failure to raise an issue timely in the district court waives review of that issue on appeal applies when "there was strong precedent" prior to the change, Curtis Publ'g Co., 388 U.S. at 143 (plurality opinion), such that the failure to raise the issue was not unreasonable and the opposing party was not prejudiced by the failure to raise the issue sooner, id. at 145. Pea Ridge and Oxide maintain that prior to the Supreme Court decision in Eastern Enterprises v. Apfel , 118 S. Ct. 2131 (1998), this court had rejected constitutional challenges to the Coal Act and that Eastern Enterprises changed the law, permitting them to raise the constitutional issue at this juncture. We disagree.

First, Eastern Enterprises cannot be viewed as effecting a change in the law of Fifth Amendment takings jurisprudence sufficient to excuse the failure to raise a takings challenge earlier. Eastern Enterprises, decided by a 4-1-4 vote, involved a challenge to the constitutionality of 26 U.S.C.A. § 9706, a provision of the Coal Act different from the one at issue here; that provision imposed retroactive liability for funding the Combined Fund on pre-1978 NBCWA signatories. Four Justices concluded that § 9706 effected an unconstitutional taking. See id. at 2146-53. The remaining five justices rejected the conclusion that an unconstitutional taking was effected, reasoning that the constitutionality of the financial burden on the company imposed by the Coal Act must be considered as a question of substantive due process rather than as a takings question because no identifiable property interest was infringed by the legislation. See id. at 2154-58 (Kennedy, J., concurring in the judgment and dissenting in part); id. at 2161-63 (Breyer, J., dissenting). Consequently, to the extent Eastern Enterprises worked any change with respect to takings jurisprudence, that change was not favorable to Pea Ridge and Oxide's position and therefore does not excuse their failure to raise their takings claim in a timely fashion.

Second, no strong precedent prevented Pea Ridge and Oxide from raising the due process issue earlier. In Holland, we rejected a due process challenge to the 1992 UMWA Benefit Plan, ruling that Congress did not act arbitrarily in concluding that signatories to NBCWAs promising lifetime health benefits should be required to fund those benefits. See Holland, 102 F.3d at 740-42. However, we did not address any separate argument related to liability of members

13

of a control group of such signatories, and that issue remained an open question. Furthermore, Eastern Enterprises did not address whether the Coal Act violated the due process rights of members of a control group of signatories to NBCWAs promising lifetime health benefits for retired miners. Rather, Eastern Enterprises can only be viewed as rendering a decision that Congress acted arbitrarily in imposing retroactive liability on a signatory to NBCWAs in existence prior to those that promised lifetime health benefits to retired miners when that signatory made no promise of lifetime benefits, did not contribute to the problem that caused the funding shortfall for the promised lifetime benefits or to the need for such benefits, and was not put on notice by any governmental action during the relevant time period that it might be subjected to later liability. See Eastern Enters., 118 S. Ct. at 2151-53 (plurality opinion); id. at 2159-60 (Kennedy, J., concurring in the judgment and dissenting in part). The position of members of a control group upon whom liability is imposed only by virtue of that association is different from that of the NBCWA signatory in Eastern Enterprises. And, the considerations bearing upon whether Congress acted rationally in imposing retroactive liability on the NBCWA signatory in Eastern Enterprises are different than those relating to the rationality of imposing liability on members of a control group of a 1978 or subsequent benefit plan signatory, although admittedly some of the same arguments can be made with respect to both issues.

Thus, we conclude that Eastern Enterprises did not constitute a change in the law permitting Pea Ridge and Oxide to raise their constitutional arguments for the first time in a Rule 59(e) motion. As such, those constitutional issues are not properly preserved for our review.**3**

_____

**3** Although the district court ruled that the constitutional claims raised by Pea Ridge and Oxide in their Rule 59(e) motion lacked merit, it did so only as an alternative holding to its principal conclusion that the constitutional issues were not properly before the court because they were not timely raised. The district court, therefore, did not excuse the default.

14

IV.

The only remaining question is whether the district court erred in imposing an "additional prefunding premium" on Coal Companies as a result of its finding that they were liable for the benefits of the disabled miners and their dependents as claimed by Trustees. In the section of the Coal Act dealing with the guarantee of benefits, Congress directed that the contribution requirement for the plan include:

> the provision of security (in the form of a bond, letter of credit or cash escrow) in an amount equal to a portion of the projected future cost to the 1992 UMWA Benefit Plan of providing health benefits for eligible and potentially eligible beneficiaries attributable to the 1988 last signatory operator. <u>If a 1988 last signatory operator is unable to provide the security required, the 1992 UMWA Benefit Plan shall require the operator to pay an annual prefunding premium that is greater than the premium otherwise applicable.</u>

26 U.S.C.A. § 9712(d)(1)(C) (emphasis added). The 1992 UMWA Benefit Plan formed by the Trustees established an additional prefunding premium of at least five times the annual funding premium. And, the district court imposed an additional prefunding premium of ten times the annual funding premium on the coal companies here. The language of the statute states that the prefunding provision is to be applied when a company is "unable" to provide the security. <u>Id.</u> The provision does not speak to the situation, like the one at issue here, when absent any showing that a company was <u>unable</u> to post the security, it declined to do so because it did not believe that it was liable. The plain language of the provision, therefore, demonstrates that an increased funding obligation is not applicable in the present situation.

V.

Congress intended through the Coal Act to ensure promised lifetime health benefits to coal industry retirees; therefore, we construe § 9711(b)(1) and § 9712(b)(2) to cover disabled retirees who retired before September 30, 1994 and their beneficiaries and affirm the judgment of the district court imposing liability and awarding attor-

15

ney's fees.[4] The additional prefunding premium imposed by the district court, however, was erroneous because there was no showing that the companies were "unable" to provide the appropriate security --only that they did not provide it. Thus, we affirm in part and reverse in part.

AFFIRMED IN PART; REVERSED IN PART
_____

[4] Coal Companies' only challenge to the award of attorney's fees rested on their argument that the district court incorrectly decided that disabled retirees were included as eligible beneficiaries. Having concluded that the district court did not err in this regard, we affirm the award of attorney's fees.

16