**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE PITTSTON COMPANY; BUFFALO
MINING COMPANY; CLINCHFIELD COAL
COMPANY; EASTERN COAL
CORPORATION; ELKAY MINING
COMPANY; JEWELL RIDGE COAL
CORPORATION; KENTLAND-ELKHORN
COAL CORPORATION; MEADOW RIVER
COAL COMPANY; PITTSTON COAL
GROUP; RANGER FUEL CORPORATION,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,
Defendant & Third Party
Plaintiff-Appellee,

v.

No. 98-2398

MICHAEL H. HOLLAND, Trustee of
the United Mine Workers of
America Combined Benefit Fund;
UNITED MINE WORKERS OF AMERICA
COMBINED BENEFIT PLAN; ELLIOT A.
SEGAL, Trustee of the United Mine
Workers of America Combined
Benefit Fund; WILLIAM P. HOBGOOD,
Trustee of the United Mine Workers
of America Combined Benefit
Fund; MARTY D. HUDSON, Trustee of
the United Mine Workers of
America Combined Benefit Fund;
THOMAS O. S. RAND, Trustee of the
United Mine Workers of America

Combined Benefit Fund; GAIL R.
WILENSKY, Trustee of the United
Mine Workers of America
Combined Benefit Fund; CARL E.
VAN HORN, Trustee of the United
Mine Workers of America
Combined Benefit Fund,
Third Party Defendants-
Appellees,

and

THE BITUMINOUS COAL OPERATORS'
ASSOCIATION, INCORPORATED;
INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
Parties in Interest.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-97-294)

Argued: September 23, 1999

Decided: December 27, 1999

Before WILKINS, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Wilkins wrote
the majority opinion, in which Judge Traxler joined. Judge Niemeyer
wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Wade Wallihan Massie, PENN, STUART &
ESKRIDGE, Abingdon, Virginia, for Appellants. Jeffrey A. Clair,

2

Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Stephen John Pollak, SHEA & GARDNER, Washington, D.C., for Appellees. **ON BRIEF:** Stephen M. Hodges, PENN, STUART & ESKRIDGE, Abingdon, Virginia; Gregory B. Robertson, HUNTON & WILLIAMS, Richmond, Virginia; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. David W. Ogden, Acting Assistant Attorney General, Helen F. Fahey, United States Attorney, Douglas N. Letter, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States. Wendy S. White, Howard R. Rubin, SHEA & GARD- NER, Washington, D.C.; Samuel M. Brock, III, MAYS & VALEN- TINE, L.L.P., Richmond, Virginia, for Appellees Holland, et al.

_____

**OPINION**

WILKINS, Circuit Judge:

The Pittston Company[1] (Pittston) appeals an order of the district court that, in relevant part, dismissed under the doctrine of claim pre- clusion Pittston's claim that the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), see 26 U.S.C.A.§§ 9701-22 (West Supp. 1999), violates the nondelegation and separation of powers doctrines of the United States Constitution by improperly placing governmental powers and federal revenues in the hands of a private entity. Pittston also appeals an order of the district court denying its motion to amend its complaint to add claims based on the Due Process and Takings Clauses of the Fifth Amendment. Concluding that the district court erred on both points, we reverse and remand for further proceedings.

_____

[1] This suit was instituted by The Pittston Company, Buffalo Mining Company, Clinchfield Coal Company, Eastern Coal Corporation, Elkay Mining Company, Jewell Ridge Coal Corporation, Kentland-Elkhorn Coal Corporation, Meadow River Coal Company, Pittston Coal Group, and Ranger Fuel Corporation. For ease of reference, we refer to this case as having been prosecuted solely by The Pittston Company.

I.

A.

The issue of health care benefits for retired coal industry workers and their dependents has a protracted history. See generally Eastern Enters. v. Apfel, 118 S. Ct. 2131, 2137-42 (1998) (plurality opinion) (discussing history leading to the enactment of the Coal Act); id. at 2165-66 (Breyer, J., dissenting) (same); Holland v. Big River Minerals Corp., 181 F.3d 597, 600-01 (4th Cir. 1999) (same); Holland v. Keenan Trucking Co., 102 F.3d 736, 738-39 (4th Cir. 1996) (same). Disputes concerning health care for miners date back to the time early in this century when such care was funded with a prepayment plan through payroll deductions and was supplied by company doctors. In the 1930s and 1940s, the United Mine Workers of America (UMWA) and coal industry employers sought changes in the method of providing essential services to miners, and from the late 1940s through the early 1970s pension and medical benefits were provided by several UMWA funds created under a series of National Bituminous Coal Wage Agreements (NBCWAs), including a 1950 and a 1974 UMWA Benefit Plan. The funding for these benefits was supplied in part by a royalty on each ton of coal mined and in part by payroll deductions. As benefits improved under UMWA plans and the number of beneficiaries increased, other factors such as a decrease in the amount of coal produced and a rapid increase in health care costs conspired to produce financial problems for the funds. In response to these financial pressures, the 1978 NBCWA allocated to signatory employers responsibility for the health care costs of their active and retired miners. The 1974 UMWA Benefit Plan remained in place, but was responsible for providing benefits only to "orphaned" retired miners --those whose former employers were no longer in business.

Despite this restructuring, the benefit plans continued to suffer financially, and by the late 1980s they were facing insolvency. Unrest concerning this situation led to an 11-month strike beginning in 1989 by mine workers against the Pittston Coal Company, which ended only after the Secretary of Labor intervened and negotiated a settlement. Thereafter, the Secretary established the Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission"), a bipartisan commission formed to assess the

4

financial outlook of the UMWA health benefit plans and to devise possible strategies to guarantee the long-term viability of the plans. The Coal Commission concluded that retired miners were entitled to the health benefits that had been promised them and that such commitments must be honored; that a statutory obligation to fund the benefits should be imposed on current and former signatories to NBCWAs; and that an improved means of funding benefits for orphaned miners should be developed. After conducting hearings on the Coal Commission's recommendations, Congress enacted the Coal Act in 1992. Congress found that

> in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

26 U.S.C.A. § 9701 note.

Toward these goals, the Coal Act legislated significant changes in health benefits for retired coal workers. Most relevant to the present case, it consolidated the 1950 and 1974 UMWA Benefit Plans into the United Mine Workers of America Combined Benefit Fund (the Combined Fund). See id. § 9702(a)(2). Coal companies pay annual premiums to the Combined Fund. See id. § 9704(a). The Fund, in turn, provides health and death benefits to coal industry retirees who, as of July 20, 1992, were eligible to receive and were receiving benefits from the 1950 or 1974 UMWA Benefit Plans and to those receiving or eligible to receive such benefits as of such date by virtue of a relationship to such a retiree. See id. § 9703.

The Coal Act provides that each retiree is assigned to a former employer that was a signatory to a NBCWA and that remains in business. Assignments are made in an order prescribed in the Act. A retiree is first assigned to the operator that was a signatory to the 1978 or subsequent NBCWA and that most recently employed the retiree in the coal industry for at least two years. See id. § 9706(a)(1). If no such operator exists, the retiree is assigned to the operator that was a signatory to the 1978 or subsequent NBCWA and that most recently

5

employed the retiree in the coal industry for any length of time. See id. § 9706(a)(2). If no operator meets those criteria, the retiree is assigned to the signatory operator that employed the retiree in the coal industry for the longest period of time prior to the effective date of the 1978 NBCWA. See id. § 9706(a)(3). These "assigned operators" are then required to pay annual premiums to the Combined Fund for each person assigned to them. See id. § 9704.

A retiree not assigned under § 9706 is an "unassigned beneficiary." See id. § 9704(d). Health care payments for unassigned beneficiaries derive from three sources, the first two being surpluses from the 1950 UMWA Pension Plan that are transferred to the Combined Fund, see id. § 9705(a), and transfers from the Abandoned Mine Reclamation Fund, see id. § 9705(b); 30 U.S.C.A. § 1232(h) (West Supp. 1999). If these sources prove insufficient to pay for the unassigned beneficiaries' health care, an "unassigned beneficiaries premium" is assessed to each assigned operator based on the number of its assigned beneficiaries. See 26 U.S.C.A. § 9705(a)(3); id. § 9704(a)(3).

An assigned operator's health benefit premium for assigned beneficiaries for any year is the product of the "per beneficiary premium" for that year multiplied by the number of eligible beneficiaries assigned to that operator under 26 U.S.C.A. § 9706. See id. § 9704(b)(1). The per beneficiary premium for each year is calculated by adjusting the per beneficiary premium for the initial year--1993-- for inflation. See id. § 9704(b)(2). The Coal Act as originally enacted provided that the Secretary of Health and Human Services (the Secretary) would calculate the amount of the per beneficiary premium and assign beneficiaries to assigned operators. See 26 U.S.C. §§ 9704(b)(2), 9706(a) (Supp. IV 1993). However, effective March 31, 1995, both of those duties were transferred to the Commissioner of Social Security (the Commissioner). See Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, § 108(h)(9)(A), (B), 108 Stat. 1464, 1487-88 (1994).

B.

Pittston is a Virginia corporation whose subsidiaries and predecessors have been mining coal in the eastern United States for the past 150 years. In 1997, Pittston initiated this tax refund action, see 26

6

U.S.C.A. § 7422 (West Supp. 1999); 28 U.S.C.A.§ 1346(a)(1) (West 1993), against the United States (the Government) seeking the return of certain premiums Pittston had paid under the Coal Act. In Count One, Pittston alleged that the Coal Act violated the nondelegation and separation of powers doctrines of the United States Constitution. On this basis, Pittston sought a refund of all payments made under 26 U.S.C.A. § 9704 for tax years 1993 through 1996. In Count Two, Pittston sought a refund of certain overpayments that it had been compelled to make under the Coal Act for tax years 1993 through 1995.[2]

The Government moved to dismiss on several grounds, including that the judgment in National Coal Ass'n v. Chater, No. CV94-H-780-S, 1995 U.S. Dist. LEXIS 21125 (N.D. Ala. July 20, 1995), aff'd, 81 F.3d 1077 (11th Cir. 1996) (per curiam), barred Pittston's action under the doctrine of claim preclusion. In National Coal, an industry group and several coal companies, including Pittston, brought an action challenging the method that the Secretary used to calculate the initial per beneficiary premium--the amount of which would affect Pittston's total Coal Act premium liability for the initial year and all subsequent years--and requesting that the Secretary be ordered to recompute the affected premiums in accordance with the applicable statute. The district court held that the Secretary's methodology was indeed incorrect and ordered the Secretary to recompute the premiums using the correct methodology. See National Coal, 1995 U.S. Dist. LEXIS 21125, at *1-2. The Eleventh Circuit affirmed. See National Coal, 81 F.3d at 1082.

The district court granted the Government's motion to dismiss Count One and denied the Government's motion to dismiss Count Two in an order dated September 11, 1997. The district court held that National Coal barred Count One because Pittston "could have ... raised" that claim in that case, J.A. 119, but that Count Two was not barred because Pittston "could not have raised" a claim for refund of overpayments before obtaining a ruling that the premium had been miscalculated, J.A. 120.

_____

[2] The basis for these overpayments arose from the Secretary's incorrect calculation of the per beneficiary premium, which we will discuss later in the opinion.

Shortly thereafter, on October 9, 1997, the Government filed a third-party complaint against the Trustees of the Combined Fund and the Fund itself (collectively, "the Trustees"). Because the Coal Act requires operators to pay premiums to the Fund directly, the Government sought indemnity for all amounts that the Government might be ordered to pay Pittston.

Following discovery regarding Count Two, Pittston and the Government filed cross-motions for summary judgment. On February 3, 1998, the district court granted Pittston's motion, denied the Government's motion, and directed the Government to refund to Pittston $1,916,641.96 in overpayments and prejudgment interest.[3] In so doing, the court held that Coal Act premiums are taxes refundable under 28 U.S.C.A. § 7422 and that § 7422 was not preempted by the Employee Retirement Income Security Act (ERISA) of 1974, see 29 U.S.C.A. §§ 1001-1461 (West 1999 & Supp. 1999). The judgment entered by the district court clerk in Pittston's favor stated that "[t]he third-party action will now proceed." J.A. 495. Pittston subsequently moved the court to amend its disposition of Pittston's suit to clarify whether the judgment was final at that time. By order filed April 1, 1998, the court amended its disposition to state that "the Court's decision and order of February 3, 1998 and the judgment entered on February 4, 1998 are not now final or appealable under Fed. R. Civ. P. 54(b) or Fed. R. App. P. 4 and shall not become final or appealable until the third-party action is concluded." J.A. 505.

C.

On June 25, 1998, the United States Supreme Court held that Congress acted arbitrarily in violation of the Fifth Amendment in imposing retroactive liability on a signatory to NBCWAs existing prior to those that promised lifetime health benefits to retired miners when that signatory made no promise of lifetime benefits, did not contribute to the problem that caused the funding shortfall for the promised lifetime benefits or to the need for such benefits, and was not put on notice by any governmental action during the relevant time period that it might be subjected to later liability. See Eastern Enterprises v.

_____

[3] The Government appealed the judgment against it, but the parties subsequently settled the matter and the appeal was voluntarily dismissed.

8

Apfel, 118 S. Ct. 2131, 2151-53 (1998) (plurality opinion); id. at 2159-60 (Kennedy, J., concurring in the judgment and dissenting in part); see also Holland v. Big River Minerals Corp., 181 F.3d 597, 606 (4th Cir. 1999) (setting forth the holding of the court). Four justices concluded that the Coal Act as applied constituted a taking and one concluded that it violated substantive due process.

Relying on Eastern Enterprises, Pittston moved on August 6, 1998 for leave to amend its complaint to add claims asserting that (1) as applied, the Coal Act constitutes a taking and violates substantive due process, and (2) the funding provisions of the Coal Act are not severable, and thus the Coal Act is invalid as to Pittston and the other contributors to the Combined Fund. The latter claim is based on Pittston's contention that Eastern Enterprises eliminated an entire class of contributors to the Combined Fund. Pittston maintains that the elimination of this source of funding materially increases the burden on other contributors to the Combined Fund and that Congress would not have passed the Coal Act without funding from the eliminated class. See Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 565 (1902) (explaining that if an unconstitutional section of a statute "is of such import that the other sections without it would cause results not contemplated or desired by the legislature, then the entire statute must be held inoperative"), overruled on other grounds by Tigner v. Texas, 310 U.S. 141, 147 (1940). Although neither the United States nor the Trustees opposed the motion to amend, the district court denied the motion on September 9, 1998, stating that "[t]he Court has already issued judgment on the Complaint, and to allow Pittston to amend the Complaint now would create undue prejudice on the opposing party." J.A. 732. On the same day, the court also granted summary judgment to the Government on its third-party claim for indemnity from the Trustees.

II.

Before reaching the merits of Pittston's appeal, we must first address two arguments made by the Government that Pittston may not recover wrongfully assessed and calculated Coal Act premiums in a tax refund action. First, the Government contends that Coal Act premiums are not taxes.[4] Second, the Government alternatively argues

_____

[4] The Government also contends that Pittston should be judicially estopped from arguing that Coal Act premiums are taxes because Pittston

9

that even if the amount of the Coal Act premiums otherwise would be recoverable in a tax refund action, the Coal Act bars remedies against the Government for wrongly assessed and collected premiums. We address these arguments in turn.[5]

A.

Absent waiver, sovereign immunity shields the United States from suit. See FDIC v. Meyer, 510 U.S. 471, 475 (1994). Congress, however, has waived sovereign immunity from suits "for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." 28 U.S.C.A. § 1346(a)(1). The question of whether Coal Act premiums are taxes such that the Government waived sovereign immunity under § 1346(a)(1) is a jurisdictional one subject to de novo review. See Global Mail Ltd. v. United States Postal Serv., 142 F.3d 208, 210 (4th Cir. 1998).

Although the Government contends that the Coal Act premiums

_____

espoused the opposite view in National Coal. Pittston vehemently argues that it took no such position in National Coal . Even assuming that Pittston did take that position, however, judicial estoppel would not bar Pittston from advancing the contrary view here. Judicial estoppel applies only to the making of inconsistent statements of fact, and therefore is of no relevance to Pittston's legal contention that the Coal Act premiums are taxes. See Folio v. City of Clarksburg, 134 F.3d 1211, 1217-18 (4th Cir. 1998) (holding that question of whether an assessment is a fee or a tax is a legal one to which the doctrine of judicial estoppel does not apply).

[5] The Trustees, as third-party defendants, join in the Government's arguments that Pittston cannot recover wrongly assessed or collected Coal Act premiums in a tax refund action against the Government. They also join the Government's position that the district court correctly dismissed Count One on res judicata grounds. See Fed. R. Civ. P. 14(a) (stating that a "third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim"); cf. F & D Property Co. v. Alkire, 385 F.2d 97, 100 (10th Cir. 1967) (explaining that "[q]uite clearly a third party defendant may resist plaintiff's motion for summary judgment to the same extent as the defendant").

10

Pittston challenges are not taxes, Fourth Circuit precedent establishes that they are. See UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 583 (4th Cir. 1996) [hereinafter Leckie]; see also Adventure Resources, Inc. v. Holland, 137 F.3d 786, 794 (4th Cir.), cert. denied, 119 S. Ct. 404 (1998); Carbon Fuel Co. v. USX Corp., 100 F.3d 1124, 1133 (4th Cir. 1996). In Leckie, in which two appeals were consolidated, bankrupt coal operators sought to sell their assets free and clear of their liabilities under the Coal Act. See Leckie, 99 F.3d at 577-79. In each case, a district court held that the assets could pass free and clear of the Coal Act liabilities. See id. at 578-79.

In the consolidated appeal, a panel of this court considered whether the district courts lacked subject matter jurisdiction to determine the successor liability question because the Anti-Injunction Act prohibits actions brought "for the purpose of restraining the assessment or collection of any tax," 26 U.S.C.A. § 7421(a) (West Supp. 1999). See Leckie, 99 F.3d at 582-85. Simultaneously, we considered whether the Declaratory Judgment Act prohibited the issuance of declaratory relief regarding the successor liability question because the Declaratory Judgment Act generally prohibits a district court from granting relief "with respect to Federal taxes," 28 U.S.C.A. § 2201 (West 1994).[6] See Leckie, 99 F.3d at 582-85. In addressing these questions, we first had to "determine whether Coal Act premiums are taxes." Id. at 583. To do so, a four-factor test was applied defining a tax as "(a) [a]n involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) [i]mposed by or under authority of the legislature; (c) [f]or public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) [u]nder the police or taxing power of the state." Id. (internal quotation marks omitted). After considering these factors, we held that Coal Act premiums are taxes. See id. Having done so, we next considered whether the Anti-Injunction and Declaratory Judgment Acts applied under the facts presented. Because the coal operators had no alternative legal way of resolving the issue of successor liability, we held that the two statutes did not preclude the district courts from reaching the merits of the motions. See id. at 584.

_____

[6] We analyzed these two issues simultaneously because of the coextensive nature of the two statutes. See id. at 584.

11

The Government makes two arguments that Leckie is not controlling on the issue of whether Coal Act premiums are taxes. First, it claims that the term "tax" has "different meanings in different contexts" and that the definition employed by this court in determining whether the Anti-Injunction and Declaratory Judgment Acts applied should be different from that utilized to determine whether the premiums are taxes for purposes of the refund statute. Brief for the United States as Appellee/Cross-Appellant at 19. We disagree. The very purpose of the two statutes discussed in Leckie is "to allow the Federal Government to assess and collect allegedly due taxes without judicial interference and to compel taxpayers to raise their objections to collected taxes in suits for refunds." Leckie , 99 F.3d at 584 (citing Enochs v. Williams Packing Co., 370 U.S. 1, 7 (1962); Flora v. United States, 362 U.S. 145, 164 & n.29 (1960)). Accordingly, a decision that a premium is a tax for the purposes of the Anti-Injunction and Declaratory Judgment Acts necessarily is a decision that an objection to that assessment must be litigated in a tax refund action.[7]

The Government also contends that Leckie is not controlling because our conclusion in that case that Coal Act premiums are taxes is merely dictum. Again, we disagree. Dictum is"a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding--that, being peripheral, may not have received the full and careful consideration of the court that uttered it." United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988) (internal quotation marks omitted); see Hormel Foods Corp. v. Jim Henson Prods., 73 F.3d 497, 508 (2d Cir. 1996); see also Gillespie v. United States Steel Corp., 321 F.2d 518, 530 (6th Cir. 1963) (concluding that statement was not dictum when "the matter was before the court ...; was argued before the court; and was passed upon by the court"), aff'd, 379 U.S. 148 (1964).

In Leckie, the decision that Coal Act premiums are taxes was clearly integral to the analytical foundations of our holding. The

_____

[7] The dissent interprets § 1346(a)(1) to waive sovereign immunity only for actions for recovery of taxes that were paid to the Government and not actions for recovery of taxes that were required by the Government to be paid to a third party. However, there simply is no support for that position in the language of the statute.

12

assertions that the Anti-Injunction Act deprived the district court of subject matter jurisdiction and that the Declaratory Judgment Act prohibited issuance of declaratory relief presented the court with two questions: whether Coal Act premiums are taxes, and if so, whether any alternative legal means existed to challenge the imposition of liability for the premiums on the purchasers of the debtors' assets. Thus, our determination that the premiums were taxes was not "peripheral" in any sense, and accordingly was not dictum.

B.

Assuming arguendo that Coal Act premiums otherwise would be collectible in a tax refund action, the Government contends that the Coal Act bars remedies against the Government for wrongly assessed and collected premiums and requires that any action for the return of such premiums be brought against the Combined Fund. In support of this position, the Government argues that several provisions of the Coal Act suggest that an operator may not bring a tax refund suit against the Government for wrongfully assessed or collected Coal Act premiums. In particular, the Government notes that the Coal Act provides for a procedure by which the Combined Fund can refund overpayments when a retiree has been incorrectly assigned to an operator, see 26 U.S.C.A. § 9706(f)(3)(A); that Congress provided that the Combined Fund shall be treated as a multiemployer plan subject to ERISA, see id. § 9702(a)(3)(C); and that ERISA establishes a remedy through which employers may recover erroneous payments from a benefit plan, see 29 U.S.C.A. § 1103(c)(2)(A)(ii) (West 1999). The Government contends that the enactment of such detailed provisions is ordinarily presumed to afford the exclusive remedy intended by Congress. See United States v. Fausto, 484 U.S. 439, 448-49 (1988). We are not persuaded by this argument.

When there are two federal statutes on "the same subject, the rule is to give effect to both if possible." United States v. Borden Co., 308 U.S. 188, 198 (1939). While the Government is certainly correct that Pittston has available to it remedies against the Combined Fund under the Coal Act and ERISA, the Government has pointed us to nothing in either act to indicate that those remedies are exclusive of all others available under federal law, including a tax refund from the Government. Indeed, we note that ERISA, while containing a very broad pre-

13

emption provision regarding state law, see 29 U.S.C.A. § 1144(a) (West 1999), specifically states that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States." 29 U.S.C.A. § 1144(d) (West 1999).

For these reasons, we hold that a tax refund action is an appropriate vehicle for Pittston to use to seek recovery of the challenged Coal Act premiums. We now turn to Pittston's arguments on appeal.

III.

Pittston first contends that the district court erred in ruling that claim preclusion barred its nondelegation and separation of powers claims. The Government maintains that Pittston, having sought judicial review of the Secretary's calculation of the initial per beneficiary premium in National Coal, is forever barred from challenging the constitutionality of the Coal Act. We agree with Pittston. See First Nat'l Bank v. Russell (In re Russell), 76 F.3d 242, 244 (9th Cir. 1996) (explaining that decision regarding whether a claim is barred by claim preclusion is reviewed de novo).

Under the doctrine of claim preclusion, a prior judgment bars the relitigation of claims that were raised or could have been raised in the prior litigation.[8] See First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters.), 81 F.3d 1310, 1315 (4th Cir. 1996). However, the doctrine does not apply to all claims that were raised or could have been raised in the prior litigation; rather, it bars such claims only when three elements are satisfied:

> 1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and, 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding.

_____

[8] Pittston contends that it could not have brought its constitutional claims in the prior litigation. However, because we conclude that the constitutional claims are not based upon the same cause of action as the claim in National Coal, we need not reach this issue.

14

Id. Here, the first two elements are satisfied, and only the third element--identity of causes of action--is in dispute. In accordance with the modern trend, we have held that the appropriate inquiry to determine whether causes of action are identical for claim preclusion purposes is whether the claim presented in the new litigation "arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." Harnett v. Billman, 800 F.2d 1308, 1313 (4th Cir. 1986); see Restatement (Second) of Judgments § 24 (1982).

No simple test exists to determine whether causes of action are identical for claim preclusion purposes, and each case must be determined separately within the conceptual framework of the doctrine. See Aliff v. Joy Mfg. Co., 914 F.2d 39, 43 (4th Cir. 1990). Generally, the court must balance the interests of the defendant and of the courts in bringing litigation to a close against the interest of the plaintiff in not being denied the right to prosecute a valid claim. See Restatement (Second) of Judgments § 24 cmt. b. The expression "transaction" in the claim preclusion context "connotes a natural grouping or common nucleus of operative facts." Id.; see In re Varat Enters., 81 F.3d at 1316. Among the factors to be considered in deciding whether the facts of the current and prior claims "are so woven together" that they constitute a single claim "are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." Restatement (Second) of Judgments § 24 cmt. b.; see Davenport v. North Carolina Dep't of Transp., 3 F.3d 89, 97 n.8 (4th Cir. 1993).

The transactions giving rise to Pittston's respective claims are not difficult to identify. The constitutional claims asserted in the present case arise from the 1993 through 1996 assessments, while the claim in National Coal arose from the Secretary's calculation of the initial per beneficiary premium. Both the National Coal claim and the constitutional claims present strictly legal issues, and the Secretary's calculation of the initial per beneficiary premium, while a necessary antecedent of the imposition of the 1993 through 1996 assessments, is clearly distinct in time, space, and origin from the assessments Pittston is now challenging. Cf. Commissioner v. Sunnen, 333 U.S. 591, 598 (1948) (explaining that in the context of income tax liability, each tax year gives rise to a new assessment and a separate cause of

15

action). Further, there is no particular reason why the constitutional claims would have combined with the calculation claim to form a convenient trial unit, nor do we see any policy consideration that would justify denying Pittston an opportunity to argue the merits of its constitutional challenges to the premiums assessed against it. For these reasons, we conclude that the constitutional claims that Pittston now asserts are not based on the same cause of action as the claim in National Coal, and therefore that the district court erred in barring them. See 46 Am. Jur. 2d Judgments§ 569 (1994) (stating that when the constitutionality of a statute is merely assumed in an earlier action, the resulting judgment is not res judicata on the constitutional-ity issue in a subsequent suit between the same parties on a different cause of action).

IV.

Pittston also contends that the district court erred in denying its motion for leave to amend its complaint after the Supreme Court issued its decision in Eastern Enterprises. We agree.

The applicable law regarding appellate review of the denial of a motion for leave to amend is set out in Foman v. Davis, 371 U.S. 178 (1962):

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amend-ment, etc.--the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportu-nity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discre-

16

tion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

Id. at 182 (citation omitted). As Foman makes clear, a court may not exercise its discretion in a way that undermines the basic policy of Rule 15. See Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir. 1980).

Here, the severability claim that Pittston sought to add could not have been advanced prior to the issuance of Eastern Enterprises, as that claim is based on the assertion that Eastern Enterprises eliminated a whole class of contributors to the Combined Fund. Accordingly, we hold that the policy favoring liberal amendment required the district court to allow the amendment and that the district court abused its discretion in refusing Pittston's request.

The takings and due process claims present a more difficult question. Pittston's delay in asserting those claims was unwarranted.[9] However, recognition of that fact does not end our inquiry. It is well established in this circuit that "[d]elay alone, without prejudice, does not support the denial of a motion for leave to amend." Deasy v. Hill,

_____

[9] That the delay in bringing the takings and due process claims was unwarranted was established in Holland v. Big River Minerals Corp., 181 F.3d 597 (4th Cir. 1999). There, after Eastern Enterprises was decided, two coal companies sought to raise takings and due process challenges to the Coal Act for the first time on a motion pursuant to Federal Rule of Civil Procedure 59(e). See Holland , 181 F.3d at 600. The companies claimed an exception to the general rule that claims raised for the first time by a Rule 59(e) motion are waived. See id. at 605. That exception exists "when there has been an intervening change in the law recognizing an issue that was not previously available." Id. Satisfying that standard requires a demonstration that "there was strong precedent prior to the change such that the failure to raise the issue was not unreasonable and the opposing party was not prejudiced by the failure to raise the issue sooner." Id. at 605-06 (internal quotation marks & citation omitted). We held that no strong precedent prevented the companies from raising the sort of takings and due process claims addressed in Eastern Enterprises prior to the issuance of that decision, and therefore that the failure to raise these claims prior to Eastern Enterprises was unreasonable. See id. at 606-07.

17

833 F.2d 38, 41 (4th Cir. 1987); see Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1044 (4th Cir. 1984) (stating that the fact that a motion for amendment was made the day of trial is not sufficient reason for denial absent prejudice to the nonmoving party); Davis, 615 F.2d at 613 (stating that"[d]elay alone ..., without any specifically resulting prejudice, or any obvious design by dilatoriness to harass the opponent, should not suffice as reason for denial" of a motion to amend). Here, Pittston's motion to amend was unopposed and the Government has not identified any way in which it was prejudiced by Pittston's failure to amend its complaint sooner than it did.

The district court, in its order denying the motion for leave to amend, did not indicate that it found any bad faith on Pittston's part and did not identify how it believed the Government might be prejudiced by the late amendment. Rather, the court stated only that it had "already issued judgment on the Complaint, and to allow Pittston to amend the Complaint now would create undue prejudice on the opposing party." J.A. 732. We read that explanation to mean that the district court considered that the lateness and delay constituted prejudice per se. Because that analysis is contrary to the law of this circuit, see Deasy, 833 F.2d at 41; Sweetheart Plastics, 743 F.2d at 1044; Davis, 615 F.2d at 613, we must conclude that the district court abused its discretion in denying Pittston leave to amend its complaint to add the takings and due process claims. See James v. Jacobson, 6 F.3d 233, 239 (4th Cir. 1993) (explaining that district court abuses its discretion by failing "adequately to take into account judicially recognized factors constraining" the exercise of its discretion or by basing its decision on "erroneous factual or legal premises").

V.

In sum, we hold that the district court correctly ruled that Coal Act premiums are taxes, that the district court erred in dismissing Count One on claim preclusion grounds, and that the district court erred in denying Pittston's motion to amend its complaint. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED

18

NIEMEYER, Circuit Judge, dissenting:

The Pittston Company had its day in court in the Northern District of Alabama in connection with its obligation, for the years 1993, 1994, and onward, to pay "premiums" or "taxes" to the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"), created under 26 U.S.C. § 9702. It should not now, in this action, be permitted to relitigate its obligation in connection with those same transactions based on new theories. As explained further below, I believe that the district court was correct in determining that Pittston's claim in this case to declare the premiums or taxes unconstitutional is barred by principles of res judicata.

More fundamentally, however, we do not have jurisdiction over this action, which Pittston characterizes as a tax refund action. Section 1346(a)(1) of Title 28, on which Pittston relies for jurisdiction, waives sovereign immunity for tax refund suits by conferring jurisdiction on district courts over claims against the United States for the recovery of taxes. Because Pittston paid no taxes to the United States, it cannot "recover" taxes from the United States under § 1346(a)(1).

For both of these reasons, I would affirm.

I

Litigation of this dispute over Combined Fund premiums began in April 1994 when Pittston and other coal operators brought suit in the Northern District of Alabama, challenging the computation of premiums they were obligated to pay the Combined Fund under the Coal Industry Retiree Health Benefit Act (the "Coal Act"), 26 U.S.C. § 9701 et seq. In that action, Pittston alleged that the United States erroneously computed the amounts payable to the Combined Fund under the Coal Act and that, as a result, it was required "to pay a premium approximately 10% greater than that authorized under the [Coal] Act." It requested that the United States be ordered to "recompute the initial premium [for 1993] and all subsequent premiums" payable to the Combined Fund. The Alabama district court agreed with Pittston and ordered the United States to recompute the premiums payable by Pittston to the Combined Fund and directed the United States to notify the Combined Fund "of the premium amount

19

that the Combined Fund should have assessed" for the years 1993 and 1994. At that point, the Combined Fund had not been named a defendant in the Alabama action even though it had assessed and collected the premiums required to be paid. The decision in the Alabama case was appealed to the Eleventh Circuit, which affirmed. See National Coal Ass'n v. Chater, 81 F.3d 1077 (11th Cir. 1996). Thereafter, the plaintiffs in the Alabama action brought suit against the Combined Fund, seeking a refund, with interest, of the excess payments. After Pittston voluntarily withdrew from that action, its co-plaintiffs won a judgment for a refund of the amounts sought. See National Mining Ass'n v. Apfel, No. 96-1385 (N.D. Ala. Feb. 10, 1999).

In connection with the same premiums paid for the same years, Pittston filed the action in this case, amplifying its claim of illegality by asserting constitutional claims. In Count I of this action, Pittston challenges the constitutionality of the Coal Act because it "places government powers and federal revenues in the hands of a private entity," the trustees of the Combined Fund. On the basis of these allegations, Pittston requests "a refund" from the United States of all "taxes or other sums" ever paid by Pittston to the Combined Fund. In Count II, Pittston alleges that the United States erroneously calculated the amounts that Pittston was required to pay to the Combined Fund for the years 1993, 1994, and 1995, requesting "a refund" from the United States of all "taxes or other sums" paid by Pittston to the Combined Fund "in excess of the statutory formula" for the years 1993-95. Following the judgment in favor of Pittston's former co-plaintiffs in the second Alabama suit and prior to this appeal, Count II of this action was settled, leaving only Count I for our consideration. On this count, the district court dismissed the claim because it arose out of the same transaction as the claim in the first Alabama case and therefore was barred by res judicata. See In re Varat Enterprises, Inc., 81 F.3d 1310, 1316 (4th Cir. 1996) ("Generally, claims are part of the same cause of action when they arise out of the same transaction or series of transactions or the same core of operative facts" (internal citations omitted)).

II

I turn first to our subject matter jurisdiction. Pittston invokes the tax refund statute as the basis for this suit, styling its action as one to

20

recover taxes from the United States. The United States, on the other hand, contends that the tax refund statute, 28 U.S.C. § 1346(a)(1), does not vest district courts with jurisdiction over claims for the "restitution" of assessments that are neither paid to the United States nor intended to support the United States. Section 1346(a)(1) provides that the district courts shall have jurisdiction of:

> Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

To support its argument that we have jurisdiction over its suit against the United States, Pittston relies on our decision in In re Leckie Smokeless Coal Co., 99 F.3d 573, 583 (4th Cir. 1996) (holding that Coal Act premiums are taxes). It argues that because premiums are taxes, it can sue the United States under 28 U.S.C. § 1346(a)(1) for a refund of taxes.

While we did hold in Leckie that Coal Act premiums are taxes, this holding does not end the inquiry here whether we have jurisdiction under § 1346(a)(1). Our decision in Leckie established that Coal Act premiums are taxes for purposes of the Anti-Injunction Act, 26 U.S.C. § 7421, and the Declaratory Judgment Act, 28 U.S.C. § 2201. Similarly, we have determined that Coal Act premiums are taxes entitled to priority over unsecured claims under the Bankruptcy Code, 11 U.S.C. §§ 503, 507. See Adventure Resources, Inc. v. Holland, 137 F.3d 786, 794 (4th Cir. 1998). However, we have not, thus far, determined whether Coal Act premiums are subject to recovery under § 1346(a)(1) as taxes "erroneously or illegally assessed or collected." This determination must be made, just as our prior determinations were made, by taking into consideration the context, policies, and objectives of the pertinent statutes -- here, the tax refund statute and the Coal Act. See King v. St. Vincent's Hospital , 502 U.S. 215, 221 & n.10 (1991) (the meaning of statutory term depends on context); United States v. Reorganized C F & I Fabricators of Utah, Inc., 518 U.S. 213, 220-24 (1996) (the term "tax" may have different meanings in the Internal Revenue Code and the Bankruptcy Code).

21

Accepting for purposes of discussion that the premiums paid to the Combined Fund are taxes for purposes of 28 U.S.C.§ 1346(a)(1), a suit based on that provision nevertheless must be against the United States for the recovery from the United States Treasury of such tax payments. The suit before us is not for such a refund. The United States neither collected Coal Act payments nor received them, and accordingly, a money judgment of the sort sought by Pittston would effect a recovery from the government of something it does not have. Such an action could only be a general damage suit, not a refund suit for the recovery of taxes paid, i.e. for moneys"had and received." To allow a general damage action against the United States would be inconsistent with both the structure and the purpose of 28 U.S.C. § 1346(a)(1). The Supreme Court has explained that § 1346(a)(1) was intended to "mirror" the common-law action of assumpsit brought against private tax collectors for monies "had and received" by the collector. United States v. Williams, 514 U.S. 527, 532 (1995); see also Flora v. United States, 362 U.S. 145 (1960). The Court of Federal Claims, which shares jurisdiction over tax refund suits, has similarly referred to the tax refund suits within its jurisdiction as "those in which `the government has the citizen's money in its pocket.'" Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1008 (Ct. Cl. 1967) (quoting Clapp v. United States, 117 F. Supp. 576, 580 (Ct. Cl. 1954)) (emphasis added). Moreover, the statutory scheme governing tax refund suits confirms that § 1346 is intended only as a vehicle to recover funds "had and received" by the United States Treasury. This is made clear by the requirement that any plaintiff bringing suit under this section first file an administrative claim with the Secretary of the Treasury. See 26 U.S.C. § 7422.

By interpreting § 1346(a)(1) to provide jurisdiction for this claim by Pittston, the majority expands the waiver of sovereign immunity beyond that authorized by Congress. See Williams , 514 U.S. at 531. In doing so, it violates the established principle that when a statute waives sovereign immunity, it must be strictly construed, and any ambiguity must be resolved in favor of preserving the government's immunity from suit. See id.; Lane v. Pena, 518 U.S. 187, 192 (1996); United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992); Schon v. United States, 759 F.2d 614, 617 (7th Cir. 1985) (Section 1346(a)(1) "is a narrow waiver of sovereign immunity, and accordingly we construe it strictly").

22

In enacting the Coal Act, Congress provided a means for obtaining premium refunds from the Combined Fund, the entity that collects and receives the premium payments. See 26 U.S.C. § 9706(f)(3)(A) (providing procedure for refunds by Combined Fund); 26 U.S.C. § 9702(a)(3)(C) (designating Combined Fund as a multiemployer plan subject to ERISA); 29 U.S.C. § 1103(c)(2)(A)(ii) (providing for recovery by employers of payments made to ERISA multiemployer plans). This is the refund procedure to which Pittston should be remitted. Significantly, Pittston's former co-plaintiffs in the Alabama action availed themselves of the remedies against the Combined Fund established by the Coal Act and, as noted above, succeeded in obtaining a judgment against the Combined Fund. See National Mining Ass'n, No. 96-1385 (N.D. Ala. Feb. 10, 1999). Limiting Pittston and other aggrieved coal operators to the remedies established by the Coal Act would be consistent with the statutory design of the Coal Act, which was meant to "provide for the continuation of a privately financed self-sufficient program." Pub. L. No. 102-486, § 19142(b)(3), 106 Stat. 3036, 3037 (1992).

Pointing to our holding in Leckie, the majority asserts that "a decision that a [Coal Act] premium is a tax for the purposes of the Anti-Injunction and Declaratory Judgment Acts necessarily is a decision that an objection to that assessment must be litigated in a tax refund action." Ante, at 12. But the only necessary implication of Leckie is that, since a coal operator's objection cannot be litigated in a suit for injunctive or declaratory relief, some post-deprivation remedy must be available. Congress sensibly provided such a remedy under the Coal Act, and the federal fisc should not be exposed to a liability that Congress clearly intended would belong to the Combined Fund.

But whether or not Pittston elects to sue the Combined Fund for its refund, it cannot sue the United States for a refund, relying on 28 U.S.C. § 1346(a)(1) for its jurisdiction.

III

Quite apart from this fatal jurisdictional deficiency, Pittston's suit is also barred by applicable principles of res judicata. Both the present action and the earlier action filed in the Northern District of Alabama contest the validity of the Coal Act premiums Pittston has been

23

obligated to pay. Indeed, both actions not only challenge the obligation to pay all past premiums, but also future premiums that could be assessed.

The doctrine of res judicata is intended to promote judicial economy and finality by requiring a plaintiff to advance in a single action all of the legal theories and demands for relief arising out of the same cause of action. The doctrine applies "even though the plaintiff is prepared in the second action (1) [t]o present evidence or grounds or theories of the case not presented in the first action or (2) [t]o seek remedies or forms of relief not demanded in the first action." Restatement (Second) of Judgments § 25. A challenge to the constitutionality of a statute can and should be brought in the same action alleging the misapplication of that statute. Cf. Chicot Cty. Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 375 (1940) (Res judicata bars litigant from raising a constitutional challenge to a statutory scheme governing the conduct at issue in a prior case where the prior litigation proceeded "on the assumption by all parties and the court itself that the statute was valid"); 46 Am. Jur. 2d Judgments § 569 (1994) ("[E]ven though the constitutionality of the statute is merely assumed in the earlier action, the judgment is nevertheless operative to prevent a relitigation of the same cause of action"); 18 Wright, Miller & Cooper, Federal Practice and Procedure§ 4411, at 92 ("The short of the matter is that theories arising from different sources of law may be blended into a single claim that must be asserted on pain of preclusion").

This circuit has followed the transactional approach to claim preclusion adopted by the Restatement (Second) of Judgments. See Keith v. Aldridge, 900 F.2d 736, 740 (1990). Pursuant to this approach, we have held that claim preclusion operates to bar"litigation by the plaintiff in a subsequent action of claims `with respect to all or any part of the transaction, or series of connected transactions, out of which the [first] action arose.'" Harnett v. Billman, 800 F.2d 1308, 1314 (4th Cir. 1986) (quoting Restatement (Second) of Judgments § 24).

In the earlier suit decided in Alabama, Pittston obtained a declaratory judgment in its favor and a final injunction directing the United States to recalculate the premiums payable under the Coal Act, both

24

for past and for future premiums, and to notify the Combined Fund of the revised calculations. Pittston's claim in this action merely seeks further relief with respect to these same transactions. Moreover, its contention that the premiums it paid were imposed pursuant to an unconstitutional statute could have been advanced in the earlier suit. Even though Pittston was the "master of its complaint" and even though its constitutional claims were available, it chose not to raise them at that time, and the claims are therefore now barred by res judicata. See Brown v. Felsen, 442 U.S. 127, 131 (1979) (Res judicata bars previously available claims "regardless of whether they were asserted or determined in the prior proceeding"); Dionne v. Mayor and City Council of Baltimore, 40 F.3d 677, 683 (4th Cir. 1994) (claim preclusion "forc[es] a plaintiff to raise all possible theories of recovery and to demand all desired remedies in one proceeding at peril of losing all not raised in it").

At bottom, Pittston's various challenges to the imposition of Coal Act premiums and its various claims for refunds arise out of the same transactions and the same set of operative facts-- the payment of premiums to the Combined Fund for the periods from 1993 forward. These challenges and claims could have been presented in the Alabama action. Accordingly, they are barred from being asserted now in this action.

Therefore, both because of our lack of subject matter jurisdiction and because of the bar imposed by res judicata principles, I would affirm the judgment of the district court. I therefore respectfully dissent.

25